THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES GAURIGE, Defendant-Appellant.

First District (2nd Division) No. 85—3249

Opinion filed April 5, 1988.—Rehearing denied April 22, 1988.

Steven Clark and Karen Michels, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, John A. Gasiorowski, and Sharon K. Bachert-Bedford, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

The defendant, James Gaurige, was indicted for the murder of Robert Deacon. Following a bench trial, Gaurige was found guilty of voluntary manslaughter and sentenced to 15 years in prison. Because Gaurige had committed the offense of voluntary manslaughter while he was on a 30-month probation for residential burglary, the trial court found Gaurige in violation of his probation. Consequently, the trial court revoked Gaurige's probation and sentenced him to a term of five years to be served consecutively with his 15-year sentence for voluntary manslaughter. Thereafter, Gaurige appealed.

Gaurige raises several contentions on appeal. First, Gaurige contends that the trial court committed reversible error when it excluded the "911 tape." Second, Gaurige argues that his use of deadly force

was reasonable under the circumstances. Third, Gaurige claims that the trial court abused its discretion when it sentenced him to 15 years for voluntary manslaughter. Fourth, Gaurige contends that the trial court again abused its discretion when it sentenced him to a consecutive five-year term for violation of probation. Fifth, Gaurige alleges that the trial court did not properly credit him for time served on probation. The following evidence was adduced at trial.

Gaurige testified to the following facts. On May 24, 1984, Gaurige attended a doubleheader baseball game at Wrigley Field. After the game, Gaurige went to the LeMoyne school yard and remained there for an hour or so with friends Robert Barrige, Bernard Banks, and Jose Sanchez. Gaurige then went to the home of Bernard Banks and remained there until it was quite late. Gaurige hired a cab to take him home. While the cab was stopped at a red light, a man, who later identified himself as Robert, jumped into the cab and began questioning Gaurige. Robert asked Gaurige if he wanted some reefer and if he wanted to make money moving furniture.

Gaurige agreed to take the cab with Robert to Robert's home on Pine Grove. When they arrived at Robert's home, the doorman opened the cab door and Gaurige and Robert proceeded into the building's lobby and took an elevator up to Robert's apartment. After they entered the apartment, Robert used his key to lock the dead bolt located on the inside of the door.

Gaurige sat down in the front room while Robert got two cans of beer from the refrigerator. Robert then reached down on the side of the table, pulled a bag of marijuana and asked Gaurige to roll it. Robert left the room and returned wearing a maroon house robe. Robert turned on the videocassette recorder and Gaurige noticed that homosexual films were playing. Robert pointed to the film and told Gaurige that he wanted to do that with Gaurige. Gaurige remained seated. Robert next proceeded to sit down next to Gaurige and grab Gaurige's thigh close to the crotch area. Gaurige pushed Robert away and started to get up, but Robert grabbed Gaurige's waist. At this time, Gaurige struck Robert with a liquor bottle.

After Gaurige struck Robert, Gaurige called 911. When the police arrived, Gaurige was unable to let them in because he could not find the key, so the police proceeded to kick in the door. Defense counsel sought to introduce Gaurige's conversation with the 911 operator (911 tape) into evidence. On the basis that the 911 tape constituted inadmissible hearsay, the trial court denied its admission into evidence.

The People first called Deacon's sister, Laura Becker, who testified to the following: About two months earlier, Becker had gone t·.

dinner with Deacon and their mother. After dinner, all three stopped at "The New Flight," a lower class gay bar where there are a lot of male prostitutes. Deacon introduced the defendant to Becker as "Jimmy Baby." Becker stated that she knew that her brother was a homosexual.

The second witness was Nathaniel Daniel, the doorman for the building that Deacon lived in located at 3930 North Pine Grove. Daniel gave the following testimony: At about 12:30 a.m. on May 25, 1984, Daniel was at the doorman's stand. A cab drove up; Deacon and Gaurige emerged from the cab and entered the building. Approximately 20 to 30 minutes after Deacon and Gaurige entered into the building, the police arrived and told Daniel that a man called and told them that he had killed a man. Daniel unlocked the front door for the policemen. One policeman returned to inquire if Daniel had an extra key to Deacon's apartment. Daniel responded that he did not. Daniel had seen Deacon and Gaurige entering the building together on about three occasions in the two or three weeks prior to May 25, 1984.

Next, the People called Chicago police officer Jesse Valles. Officer Valles and his partner Officer Miller were called to Deacon's apartment at about 12:30 on the morning of May 25, 1984. After the doorman let them in, the policemen went to Deacon's apartment and talked to Gaurige through the door. The tone of Gaurige's voice was very calm. Officer Miller went downstairs to get another key, but he was unable to obtain one. Gaurige told the policemen that this was not his apartment and the guy who lived in the apartment was passed out on the couch.

The policemen proceeded to break in the door and enter the apartment. They observed Deacon lying on the couch with blood on his face and neck. At this point, Officer Valles placed Gaurige under arrest and informed him of his rights.

The People's fourth witness was Officer Tim McKeough, a Chicago police crime lab technician. On May 25, 1984, Officer McKeough and his partner were called to process a crime scene in an apartment located at 3930 North Pine Grove. Upon entering the apartment, Officer McKeough observed a white male lying on the couch with a faint odor of alcohol. No drugs were found in the apartment, but there was broken glass on the couch and around the victim and beer cans on the nearby coffee table.

Detective Phillip Mannion was the People's fifth witness. Detective Mannion testified that on May 25, 1984, he was assigned to investigate a homicide at 3930 North Pine Grove. At about 4 a.m., Detective Mannion interviewed Gaurige. Detective Mannion gave an

account of his interview of Gaurige:

"I [Detective Mannion] asked him [Gaurige] what had happened earlier that evening. He stated that he had been visiting a friend over in the area of Broadway and Patterson and that upon leaving his house, his friend's house, he waived [*sic*] down a cab in order to go home.

He got in the cab and as the cab took off a short time later Mr. Deacon got in the cab. Once in the cab Mr. Deacon asked him if he wanted to smoke a joint, he said that he would. Mr. Deacon said that they would have to go to his apartment in order to do so.

While on the way over to the apartment, Mr. Gaurige stated that Mr. Deacon told him that before getting there they'd have to go into an alley, and once in the alley that Mr. Gaurige would have to suck Mr. Deacon's penis. Mr. Gaurige said that he won't do it but that he would still go with him to the apartment. They went to the apartment.

Once they were at the apartment they went inside, Mr. Gaurige sat down, Mr. Deacon offered him some beer, gave him a beer and turned on the TV, putting on a pornographic movie. Mr. Deacon went into another room.

Shortly thereafter he came out dressed in a robe, sat down on the couch, asked Mr. Gaurige to sit next to him, Mr. Gaurige did. Mr. Deacon then put his, his being Mr. Deacon's, hand on Mr. Gaurige's thigh. James Gaurige said at that point he got up, took a bottle that was sitting on a table in front of him and struck Mr. Deacon in the face with the bottle. Mr. Gaurige—Mr. Deacon started to yell at which time Mr. Gaurige picked up a phone, struck him two to three more times until he stopped yelling and until he stopped moving.

After that he went—tried to get out of the apartment, found that the door was locked and upon not being able to get out of the apartment he called the police."

The People's sixth witness was forensic pathologist, Dr. Eupil Choi. Dr. Choi testified that he performed an autopsy on Deacon. Pursuant to the external examination, Dr. Choi found a blunt one-half-inch trauma laceration on Deacon's forehead, four stab wounds on the right side of Deacon's neck, a one-quarter-inch laceration on Deacon's chest, and a two-inch defensive laceration on Deacon's right wrist. Dr. Choi concluded that Deacon's wounds could have been the result of one blow wherein the shattering glass was responsible for Deacon's additional neck, chest and wrist injuries. On the other hand, Dr. Choi

stated that Deacon's wounds could have been the result of three separate blows.

Next, the People called Ken Kinkawa, an employee of Deacon's, to the stand. Kinkawa testified to the following: Deacon gave Kinkawa a ride home from work on the evening of May 24, 1984. Deacon told Kinkawa that Deacon was going to "Flight," a gay hustler bar. Later that evening, Kinkawa went to "The Loading Dock," a gay bar, and saw Deacon. Deacon introduced Kinkawa to Gaurige and after 10 minutes or so, Deacon and Gaurige left.

The People called Assistant State's Attorney George Velcich as their final witness. Velcich testified that at about 6:30 a.m. on May 25, 1984, he advised Gaurige of his *Miranda* rights and interviewed Gaurige in the presence of Detective Mannion. Velcich then called a court reporter to take Gaurige's statement. Prior to trial, the court denied Gaurige's motion to suppress Gaurige's written statement.

Velcich proceeded to read Gaurige's written statement into the record. Gaurige's written statement provides substantially the same account of events that Gaurige gave to Detective Mannion.

Gaurige was found guilty of voluntary manslaughter and sentenced to 15 years in prison. The trial court then held a sentencing hearing for Gaurige's probation violation, revoked Gaurige's probation, and sentenced him to a five-year term of imprisonment to be served consecutively with his 15-year sentence. On November 7, 1985, Gaurige filed notice of this appeal.

### I. 911 TAPE

 The trial court should not have excluded introduction of the 911 tape into evidence. After he struck Deacon with the liquor bottle, Gaurige called 911. Gaurige spoke with a 911 operator. Gaurige's conversation with the 911 operator was taped. The conversation can be summarized as follows:

> Gaurige sounded frantic and upset as he first began talking to the operator. Gaurige told the operator that he was locked in and could not get out. The operator asked for the address; Gaurige responded that he did not know the address but that he hit a guy with a bottle and the guy was out cold and that Gaurige had to get out because the guy was going to molest him. The operator told Gaurige to remain calm and again asked for the address. Gaurige told the operator that he was in an apartment building—20th floor—and that this guy was trying to molest him and that Gaurige would kill this guy—Gaurige had to get out. Gaurige was crying continuously and the operator

kept telling Gaurige to remain calm. Gaurige cried that he was only 19 and that this guy was 33 years old. Gaurige gave the operator his name and was eventually able to provide the operator with an address. The operator told Gaurige that help would be sent and told Gaurige that he could hang up the phone.

The police arrived shortly thereafter.

Gaurige argues that the trial court erred when it refused to admit the 911 recording. Gaurige contends that the 911 recording vividly demonstrates his subjective belief at the time of the killing that he was in danger of severe bodily harm and of being the victim of a forcible felony. The trial court excluded the 911 recording on the basis that a proper foundation was not laid.

Under Illinois law, sound recordings which are otherwise competent, material and relevant are admissible into evidence if a proper foundation has been laid to assure the authenticity and reliability of the recordings. (*People v. Melchor* (1985), 136 Ill. App. 3d 708, 711, 483 N.E.2d 971; *People v. Johnson* (1984), 122 Ill. App. 3d 532, 540, 461 N.E.2d 585; *People v. McCommon* (1979), 79 Ill. App. 3d 853, 866, 399 N.E.2d 224.) An adequate foundation is laid when a witness to the taped conversation testifies that the tape accurately portrays the conversation. *People v. Williams* (1985), 109 Ill. 2d 327, 338, 487 N.E.2d 613.

In the instant case, Gaurige made the following offer of proof as to the 911 recording's authenticity and reliability. Gaurige testified at trial that; after striking Deacon, Gaurige dialed 911; defendant's exhibit No. 4 (the 911 tape) was the tape Gaurige had listened to that morning, placing his initials in the upper left-hand corner of the tape; the voices on the 911 tape belonged to Gaurige and the 911 operator; the 911 tape was a true and accurate recording of the phone call Gaurige made on May 25, 1984.

The parties stipulated that Dale Coventry, an employee of the public defender's office, was Gaurige's attorney and that Coventry served a subpoena upon Louis Schoenfeld, a superintendent of the records division of the Chicago police department. The parties further stipulated that upon the subpoena's return, Coventry received a sound recording. Coventry listened to the recording. The recording that Coventry had received pursuant to the subpoena was the same recording identified as defendant's exhibit No. 4.

Defense counsel had subpoenaed Schoenfeld, but Schoenfeld failed to appear at the appointed time. So as not to delay the case, the trial court would not enforce the subpoena. Defense counsel stated that if

called to testify, Schoenfeld would state that: he is a Chicago police officer in charge of the communications section; tapes are recorded when people call 911; such recordings are made in the normal and ordinary course of business; and such recordings are kept for 30 days before they are removed from the master tapes and placed on cassettes and that the cassette containing the information in question was given to Coventry.

In light of the facts recited above, we hold that Gaurige had laid an adequate foundation for admission of the 911 tape. Thus, the trial court erred in excluding the 911 tape on the basis that an inadequate foundation was laid.

■ Regarding this same issue, the People contend that even if a sufficient foundation was laid, the 911 tape constituted inadmissible hearsay. We disagree. Hearsay is an out-of-court statement used to prove the truth of the matter asserted. (*People v. Britz* (1984), 128 Ill. App. 3d 29, 44, 470 N.E.2d 1059, *aff'd* (1986), 112 Ill. 2d 314, 493 N.E.2d 575.) To qualify as hearsay, the evidence offered must be an out-of-court statement *and* must be used in court to show the truth of the matter asserted therein. *Britz*, 128 Ill. App. 3d at 44.

■ Here, the 911 tape that Gaurige offers into evidence is an out-of-court statement. Gaurige, however, does not seek to use the 911 tape to prove the truth of the matter asserted. Rather, Gaurige seeks to demonstrate, via his voice, that he was frantic, fearful, and agitated at the time he called 911 and that he subjectively believed that he was in imminent danger of death or serious bodily harm. In sum, the 911 tape does not constitute hearsay. We conclude, however, that the trial court's exclusion of the 911 tape was not reversible error.

## II. USE OF FORCE

■ The trial court properly found that Gaurige's use of deadly force was unreasonable under the circumstances. Section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 7—1) sets forth when a person is justified in using force against another:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

■■ ■ It is always an issue for the trier of fact to determine whether a killing is justified under the law of self-defense. (*People v. Reeves* (1977), 47 Ill. App. 3d 406, 409, 362 N.E.2d 9.) "The difference between a justified killing under self-defense and one not justified, amounting to voluntary manslaughter, is that in the former instance the belief that the use of force is necessary is reasonable under the circumstances, and in the latter, the belief is unreasonable." (*People v. Joyner* (1972), 50 Ill. 2d 302, 306-07, 278 N.E.2d 756.) Whether the defendant was reasonable in his belief that deadly force was necessary depends upon the surrounding facts and circumstances of the case. (*People v. Henry* (1980), 86 Ill. App. 3d 602, 604, 408 N.E.2d 228.) Although the determination at the trial level of the self-defense issue is not to be lightly set aside, a reviewing court has a duty to reverse the conviction if the evidence is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt as to the defendant's guilt. *Henry*, 86 Ill. App. 3d at 604; *Reeves*, 47 Ill. App. 3d at 409.

■ In the present case, the trial court made the following ruling on Gaurige's self-defense claim:

"After reviewing all the evidence in the case, and disregarding any arguments heretofore made, notwithstanding the fact that it is the opinion of the court at the time of the killing the defendant believed the circumstances existed which would justify the use of deadly force. But his belief was, under the circumstances, unreasonable based upon those facts.

It is the decision of the court, the defendant hereby found guilty of voluntary manslaughter."

Gaurige contends that the trial court's finding on his self-defense claim is erroneous. Gaurige characterizes Deacon as a 42-year-old homosexual aggressor who induces Gaurige into his apartment, changes into a robe, plays homosexual films and then sexually attacks Gaurige. In order to protect himself from sexual assault, Gaurige grabs the closest object (a liquor bottle) and smashes it over Deacon's head. Gaurige argues that shattering the liquor bottle over Deacon's head was the force that was necessary to prevent imminent death or great bodily harm to himself. Gaurige concludes that based on the surrounding circumstances, his actions were justified.

We disagree with Gaurige's contention. We find that the record provides sufficient evidence in support of the trial court's finding that Gaurige's use of deadly force was unreasonable under the circumstances. The record indicates: Gaurige went willingly to Deacon's apartment; Gaurige and Deacon were seen together on previous occasions; Gaurige did not attempt to leave the apartment after Deacon

turned on the homosexual films and donned a bathrobe; Deacon did not verbally threaten Gaurige; Deacon did not possess any type of weapon and Deacon only began to rub Gaurige's thigh when Gaurige struck Deacon with the liquor bottle. Therefore, we find that the evidence is not so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt as to Gaurige's guilt.

### III. SENTENCE FOR VOLUNTARY MANSLAUGHTER

The trial court did not abuse its discretion when it sentenced Gaurige to 15 years. Voluntary manslaughter is a Class 1 felony. (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(c).) Following a defendant's conviction of a Class 1 felony, the court may impose a sentence of imprisonment that shall be not less than four years and not more than 15 years. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(4).) Under Illinois law, the determination and imposition of a prison sentence falls within the broad discretion of the trial court. (*People v. Willingham* (1982), 89 Ill. 2d 352, 364-65, 432 N.E.2d 861; *People v. La Pointe* (1982), 88 Ill. 2d 482, 492, 431 N.E.2d 344.) In order to reach a reasoned judgment as to the proper sentence to impose, the trial court must look to the particular circumstances of each case and take into consideration the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) Thus, it is the trial court that is in the best position to determine the appropriate punishment and its determinations in regard to sentencing are to be given great weight and deference. *People v. Younger* (1986), 112 Ill. 2d 422, 427, 494 N.E.2d 145.

A reviewing court may, pursuant to Supreme Court Rule 615(b)(4), reduce a defendant's sentence. (107 Ill. 2d R. 615(b)(4).) However, absent an abuse of discretion on the part of the trial court, a reviewing court will not disturb the defendant's sentence. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 494, 508 N.E.2d 708.) A reviewing court, therefore, is reluctant to reduce a defendant's sentence which falls within the statutory limitations, unless the sentence imposed is clearly at variance with the purpose and spirit of the Constitution. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641.

After Gaurige was found guilty of voluntary manslaughter, a sentencing hearing was held. In aggravation, the People argued that at the time of the killing, Gaurige was on probation and failed to follow the conditions of his probation. The People added that Deacon's injuries were of a brutal and heinous nature. Next, the People requested that the defendant be given an extended-term sentence. Fi-

nally, the People argued that the defendant's self-defense argument was contradicted by the fact that the defendant sustained absolutely no injuries.

In response, Gaurige argued that the shattering of the bottle over Deacon's head my have been the *only* cause of the several injuries discovered on Deacon's body. Further, Gaurige argued that Deacon himself locked the door from the inside and that immediately after the incident, Gaurige called the police. Finally, Gaurige stated that he believed that he exercised the force necessary to protect himself.

The trial court then imposed sentence:

> "Mr. Gaurige, I've considered your background. I've also considered the pre-sentence investigation which has been made a part of the record herein. I've considered the State's request by this Court to apply an extended term. I've also considered the plea by your attorney involved herein, your age. And all of these factors were considered by me. And based on all of these facts, it is the opinion of this Court that you will be required to serve a sentence of fifteen years in the Illinois Department of Corrections, and you will be given credit for all time spent awaiting trial in this case."

Gaurige contends that his 15-year sentence "clearly constitutes a great departure from fundamental law, its spirit and purpose." Gaurige argues, therefore, that his sentence should be reduced from 15 years to four years. Gaurige cites several cases in support of his position. (See *People v. Pickett* (1976), 35 Ill. App. 3d 909, 342 N.E.2d 766; *People v. Walker* (1972), 4 Ill. App. 3d 294, 280 N.E.2d 726; *People v. Robbins* (1971), 1 Ill. App. 3d 651, 274 N.E.2d 908.) In *Pickett*, *Robbins*, and *Walker*, the appellate court reduced the defendant's sentence for voluntary manslaughter. These cases, however, can be distinguished from the case at bar.

Gaurige also contends that his 15-year sentence is disproportionate to the nature of his crime. Gaurige cites three cases in support of his contention. (See *People v. Vincson* (1973), 15 Ill. App. 3d 934, 305 N.E.2d 671; *People v. Silva* (1971), 2 Ill. App. 3d 117, 276 N.E.2d 29; *People v. Mitchell* (1969), 116 Ill. App. 2d 343, 252 N.E.2d 775.) In *Vincson*, *Silva*, and *Mitchell*, the defendants were convicted of voluntary manslaughter. The defendant in *Vincson* shot the victim eight times and received a sentence of three to nine years. In *Silva*, the defendant shot the unarmed victim five times in the back and chest and wounded a girl; he received an 8- to 10-year prison term. Finally, the defendant in *Mitchell* was a 16-year-old boy who stoned a man unconscious and then took the man's belongings, leaving him to die.

The *Vincson, Silva,* and *Mitchell* decisions do not support Gaurige's contention that his sentence is disproportionate to the nature of his crime. The *Vincson, Silva,* and *Mitchell* courts simply held that, considering the brutal way in which the killings were committed, in addition to other factors, the sentences imposed at the trial level were not excessive. These courts did not set forth a scale equating the nature of the defendant's offense with a specific length of imprisonment. The reviewing courts in *Vinson, Silva,* and *Mitchell* could very well have believed that each defendant's sentence was not severe enough. As a reviewing court, however, the *Vincson, Silva,* and *Mitchell* courts were to answer only one question: Did the trial court abuse its discretion when it imposed the defendant's sentence? In each case, the court simply replied that the trial court had not abused its discretion.

We find that the record supports the defendant's sentence. In sum, the evidence does not show that Gaurige was sufficiently provoked or that the offense was one of sudden or intense passion. Although Gaurige was aware of Deacon's homosexual tendencies, Gaurige did not react until Deacon began rubbing Gaurige's thigh. When Gaurige did react, he reacted violently, shattering a liquor bottle over Deacon's head. In his statement, Gaurige testified that he then picked up the phone and hit Deacon with it two or three times. Gaurige admitted that Deacon had no weapons and did not verbally threaten him. In addition, Gaurige was on probation for residential burglary. Finally, Gaurige's sentence fell within the statutory limitations. We hold, therefore, that the trial court did not abuse its discretion when it sentenced Gaurige to 15 years for voluntary manslaughter.

### IV. SENTENCE FOR VIOLATION OF PROBATION

 Because it is unclear what factors the trial court considered in imposing Gaurige's five-year consecutive sentence, a new sentencing hearing is required. When a defendant's probation is revoked, the trial court may impose a sentence on the defendant that would have been appropriate for the original offense. (*People v. Jones* (1985), 134 Ill. App. 3d 1048, 1050, 481 N.E.2d 726.) Where revocation of a defendant's probation is the result of a subsequent offense, "the defendant may be sentenced to a term of imprisonment to be served consecutively to the term of imprisonment imposed for the offense which constituted the violation of the terms of probation." (*Jones,* 134 Ill. App. 3d at 1050.) While the trial court may take into account the defendant's conduct while on probation to assess the defendant's re-

habilitation potential, it is well established in Illinois that a sentence imposed following a revocation of probation must be for the original offense. *People v. Deskin* (1977), 47 Ill. App. 3d 328, 361 N.E.2d 1188.

■■■ ■ Furthermore, the record must clearly show that the court considered the original offense when imposing the sentence. (*People v. Clark* (1981), 97 Ill. App. 3d 953, 424 N.E.2d 9.) Thus, the record should show that the trial court: "(1) considered the evidence, if any, received during the original trial, (2) considered any pre-sentence reports, (3) considered evidence and information in aggravation and mitigation, (4) heard arguments regarding sentence alternatives, and (5) afforded the defendant an opportunity to speak in his own behalf." *Clark*, 97 Ill. App. 3d at 956; see also *Deskin*, 47 Ill. App. 3d at 330-31.

In *Clark*, the defendant was found guilty of violating the conditions of his probation and sentenced to a five-year term of imprisonment with two years of mandatory supervised release. On appeal, the defendant argued that the trial court considered improper factors when it imposed the defendant's sentence. The appellate court noted that the trial record should clearly show that the trial court imposed sentence for the original offense. (*Clark*, 97 Ill. App. 3d at 956.) On appeal, the court found that the record did not show what factors, beyond the act resulting in revocation of probation, the trial court had considered in imposing sentence. Thus, the appellate court concluded that it was unable to determine whether the trial court had abused its discretion. The court, therefore, vacated the defendant's sentence and ordered that a new sentencing hearing take place. *Clark*, 97 Ill. App. 3d at 957.

In *Deskin*, the defendant pled guilty to the charge of driving while his license was revoked. The court placed the defendant on a six-month probation. About two weeks before the defendant's probation was to end, the State filed a petition to revoke the defendant's probation. The petition alleged that the defendant had, on two occasions, violated the terms of his probation by driving while his license was revoked. After a hearing, the trial court found that the defendant had violated his probation and sentenced the defendant to six years in prison.

On appeal, the defendant argued that the trial court abused its discretion when it sentenced the defendant based upon the acts for which his probation was revoked rather than limiting itself to the underlying conviction. The appellate court specifically noted the trial court's words at the sentencing hearing. The trial judge remarked:

"It's not necessary that I make a sentence with respect to each incident and then direct that they run concurrently. If I were required to do that, that is the way I would have them run, concurrently rather than consecutively." *Deskin*, 47 Ill. App. 3d at 330.

The appellate court stated that in imposing sentence following revocation of probation, a trial court may consider a defendant's conduct while on probation. However, the trial court may not commingle the matters relating to the original offense with the conduct that gave rise to the probation revocation. (*Deskin*, 47 Ill. App. 3d at 330.) The appellate court concluded that, based upon the trial court's remarks concerning concurrent or consecutive sentences, the trial court improperly commingled the initial offense and the conduct giving rise to the probation revocation. Therefore, the appellate court ordered a new sentencing hearing. *Deskin*, 47 Ill. App. 3d at 331.

In the case at bar, the trial court made the following remarks at Gaurige's probation revocation sentencing hearing:

"Mr. Gaurige, as you know, you, in fact, were placed on probation. One of the requirements of your probation were you were not to go into—not to get into any type of trouble with a law enforcement agency.

Your attorney indicated the nature of the original violation of probation you were placed on—the original probation you were placed on was not predicated by any crime of violence. But, unfortunately, you weren't satisfied with being given an opportunity to rehabilitate yourself. You were taking other steps.

This Court considered every one of the ramifications of the nature of the charges and the guilt that you were found of. The State had requested that an extended term be given because of the heinous nature of the crime. I consider your youth and your age, and I impose the sentence—I imposed the sentence that I felt was a reasonable sentence to be imposed in the other case that your basis of the violation of probation is based on herein.

After due consideration of all of the facts and the background and the nature of the charges before this Court, and *I could consider the fact that I was not the judge that placed you on probation. I'm not making any comment about that. Those things have happened. I have no way of knowing the reason for them.* The only thing I know is I have a duty and obligation to make a determination on what sentence to be imposed upon you. Based upon all of these facts I believe that I have a duty to protect the general public.

I think that you have indicated you were given an opportunity to avail yourself of rehabilitation and you have not availed yourself of that. A life was taken. I certainly did not find you guilty of murder, but I found you guilty of a lesser included offense of voluntary manslaughter. That in itself is a crime of violence.

Accordingly, based upon those facts as I had previously stated, I think I have a duty to protect the general public. It's the opinion of the Court that you be required to serve a sentence of five years to run consecutive to the sentence heretofore imposed in 84-6271, credit for all time spent awaiting trial of this case. Any time in custody with reference to the probation will not be credited to you with reference to the sentence that I have just imposed." (Emphasis added.)

The trial court's language set forth above does not clearly show that the five-year consecutive sentence that the trial court imposed was for Gaurige's underlying conviction: residential burglary. Thus, the trial record does not show what factors, beyond the act resulting in revocation of probation, the trial court considered in imposing sentence. Since it is impossible to determine whether the trial court abused its discretion, we order that Gaurige's five-year consecutive sentence be vacated and a new sentencing hearing be conducted.

### V. CREDIT FOR PROBATION

██ Gaurige is entitled to credit for the time he served unconfined on probation; moreover, the trial court committed error when it denied Gaurige credit for the time that he served in custody awaiting his probation revocation hearing. In the present case, Gaurige pled guilty to residential burglary and was placed on 30 months' probation. While on probation, Gaurige was charged with murder. The trial court found Gaurige guilty of voluntary manslaughter and sentenced him to 15 years in prison with credit for all time in custody awaiting trial. The trial court then imposed a five-year sentence, to run consecutively with Gaurige's 15-year sentence, and credited Gaurige for all time spent awaiting trial. The trial court further added, however, that any time that Gaurige had spent in custody with reference to his probation *was not* to be credited to his sentence.

Gaurige contends that the trial court erred in refusing to credit him for all time spent *in custody* awaiting the hearing on the violation of probation. In addition, Gaurige contends that he should receive credit for the time that he has already served unconfined on probation.

Section 5—8—7(b) of the Unified Code of Corrections states that an offender shall receive credit for time spent in custody as a result of the offense for which the sentence was imposed. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—7(b).) Section 5—6—4(h) of the Unified Code of Corrections provides that an offender *shall receive credit* for time served on probation, conditional discharge or supervision unless the court orders otherwise. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—6—4(h).) Although inapplicable to the case before this court, it should be noted that Public Act 85—628 (effective January 1, 1988) amends section 5—6—4(h) of the Unified Code of Corrections. The amendment provides that an offender *shall not receive credit* for time served on probation unless the court orders otherwise.

Thus, section 5—8—7(b) applies when the time for which credit is sought, was served in confinement, whereas section 5—6—4(h) applies when the time for which credit is sought, was served *unconfined* on probation, conditional discharge, or supervision. (*People v. Scheib* (1979), 76 Ill. 2d 244, 251, 390 N.E.2d 872.) A defendant, therefore, must be "fully credited for any time which he has spent in jail for a particular offense, regardless of whether the time in confinement was considered served as part of a condition of probation or conditional discharge." *Scheib*, 76 Ill. 2d at 251.

In the case at bar, the trial court stated that any time that Gaurige was in custody with reference to the probation was not to be credited to his sentence. According to section 5—8—7(b) and *Scheib*, Gaurige must be credited for any time spent in custody. Thus, the trial court erred in denying Gaurige credit for the time that he spent in custody awaiting hearing of his probation violation.

▪▪ Moreover, the record indicates that the trial court did not comment on whether Gaurige was to receive credit for the time that he served *unconfined* on probation. Section 5—6—4(h) governs here. Under section 5—6—4(h), a defendant is entitled to credit for time served unconfined on probation unless the court expressly denies the defendant credit. (*People v. Hollingsworth* (1982), 89 Ill. 2d 466, 468, 433 N.E.2d 682.) Therefore, because the trial court remained silent on this issue, Gaurige is entitled to credit for the time he served unconfined on probation.

Thus, this cause is remanded to the trial court with directions to issue a corrected mittimus allowing credit for the time that Gaurige was in custody awaiting his probation revocation hearing and credit for the time that Gaurige served unconfined on probation.

In view of the foregoing, we hold that the trial court's exclusion of the 911 tape did not constitute reversible error. We affirm the trial

court's finding that Gaurige's use of deadly force was unreasonable under the circumstances. We likewise affirm the trial court's imposition of the 15-year sentence on Gaurige for his voluntary manslaughter conviction. Finally, we order that this case be remanded to the trial court with directions to vacate Gaurige's five-year consecutive sentence and to conduct a new sentencing hearing and with directions to issue a corrected mittimus allowing credit for the time that Gaurige was in custody awaiting his probation revocation hearing and credit for time that Gaurige served unconfined on probation.

Affirmed in part, vacated in part and remanded with directions.

HARTMAN, P.J., and BILANDIC, J., concur.