THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN GOLDEN, Defendant-Appellant.

First District (5th Division)   No. 1—92—0456

Opinion filed April 16, 1993.

Rita A. Fry, Public Defender, of Chicago (Tina Liebling, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara L. Jones, Kelly S. Caner, and Jason H. Payne, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Defendant Melvin Golden was charged with first-degree murder. Codefendant Vincent Williams was also charged with first-degree murder on an accountability theory. After a joint bench trial, Golden was convicted of second-degree murder and sentenced to 12 years in the penitentiary. Williams was acquitted on a motion for directed finding. Golden has timely appealed his conviction and sentence pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603).

The three following issues are presented for review: (1) whether the court properly found defendant guilty of second-degree murder upon finding that due to mitigating circumstances the State had not proved defendant guilty of first-degree murder; (2) whether the murder statute satisfies due process constitutional principles by requiring defendant to prove by a preponderance of the evidence that his belief in self-defense was unreasonable; and (3) whether the court abused its discretion in sentencing defendant to 12 years' imprisonment.

On February 16, 1990, defendant Melvin Golden shot and killed Anthony McGruder. Defendant asserted that he had shot McGruder in self-defense. The State presented three occurrence witnesses: Mervin Douglas, Trina Steward (deceased's sister) and Ronie Brown. Defendant and Pamela Williams (codefendant Williams' sister) testified for the defense.

Mervin Douglas testified that on February 26, 1990, between 6:30 and 7:30 p.m., he was walking east on Washburne Street in Chicago, Illinois, toward his aunt's house. It was dark out but there were streetlights.

As Douglas approached 1942 West Washburne Street, he saw the deceased, codefendant Williams, and defendant on the sidewalk in front of Williams' house. He was on the same side of the street as they were. Douglas was 16 years old and had known Williams and the deceased for over five years, but had known defendant for less than two months. Defendant and Williams were two to three feet apart, facing west on Washburne toward Damen Avenue.

Douglas further testified that Williams, Golden and the deceased were arguing. There was shouting, but he could not tell who was doing the shouting. There were at least seven people on the porch of Williams' house on Washburne Street. In a blue car double-parked in the street were Trina Steward, Andrew Howard, Simmy McGruder and another man Douglas did not recognize. Trina Steward was sitting in the driver's seat. He stopped about 10 or 12 feet away and listened, but could not understand what the three men were saying, except for hearing the deceased mention his cousin DeWayne McGruder. He denied on cross-examination that he heard the deceased say, "My cousin is too little for you, and if anything happens to him I'll get you." It was, however, stipulated that Douglas made the statement to a detective investigating the homicide of Anthony McGruder.

The three men walked away from each other and then walked back toward each other. Codefendant Williams then pushed the deceased on the upper part of his body. At that point, to avoid involvement, Douglas testified that he got off the sidewalk, went around a red car parked at the curb, walking onto the street. He stopped and looked. He was then a few feet from the blue car in which Steward, Howard and Simmy McGruder sat. He stopped, looked and saw shots from a gun which he described as two sparks of "fire jumping out of a gun." He did not see who was holding the gun but saw that the shots came from defendant. The deceased's back was to Douglas and only defendant faced Douglas. He did not know the number of shots

fired. Defendant, however, at that point stood beside codefendant Williams, about four or five feet from the deceased.

After seeing the two sparks from the gun, Douglas lay down in the street beside the red car. He heard more gunshots and eventually got up from the ground. He looked around and saw that Williams and Golden were gone. He watched the deceased run around the rear of the red car and into the street, where he collapsed. Simmy McGruder and Andrew Howard picked up the deceased, put him in the blue car, and rode away. Douglas testified that he did not see the deceased with a gun at any time.

A few moments later Douglas saw defendant; defendant stumbled, but did not fall down. Douglas asked defendant if he had been shot. Defendant said, "No, get away from me," and pointed a gun at Douglas.

Deceased's sister, Trina Steward, also testified. She was 25 years old at the time of the trial. She had known codefendant Williams for over 10 years, but had known defendant for less than two months. At about 7 p.m. Trina was driving her car. In the car with her were the deceased, Ronie Brown and Andrew Howard. On direct examination she stated that Simmy McGruder was not in the car, but on cross-examination she stated that Simmy was in the car, but got out at some point. Trina double-parked her car two houses from Williams' house at 1942 West Washburne, and the deceased got out of the car. Williams was standing in front of his house. The deceased and Williams talked for about 15 minutes, but Trina could not hear what they said. She was talking to Ronie Brown and the car radio was playing. Then codefendant Williams and the deceased raised their voices and began arguing. At that point Trina turned the radio volume down and began watching them. She saw Williams push deceased in the chest. At some point defendant came out from "by the hallway" and stood down the street about 15 feet away from Williams. Williams was facing Trina. Deceased was wearing a coat and had his back towards her. Before Williams pushed the deceased, defendant had not argued with the deceased. After Williams pushed the deceased, defendant said something, after which Trina heard about two gunshots that came from where defendant stood. On cross-examination she testified she heard a total of four shots. She immediately turned around and saw defendant shooting from about 15 feet away. At the time she heard the gunshots she could not see the deceased's hands, although she saw him make a hand motion. His back was to her during the shooting but she never saw him with a gun while she was at the scene. After the shooting Trina saw the deceased run toward her car, falling

down. He yelled that he had been shot. Howard got out of the car first, followed by Trina and Brown. Howard and Brown picked up the deceased and put him in the car. Trina did not see the deceased with a gun. She saw no one shooting that night except defendant. She saw that the deceased was injured and drove him to the hospital. On cross-examination she acknowledged that there was "bad blood" between her family and defendant.

The last witness for the prosecution was Ronie Brown, who had been at the scene of the shooting as a passenger in Trina's car. He had known the deceased for about five years and the deceased was his good friend. He had known codefendant Williams for about one year. He testified that he saw Williams and the deceased talking. He then heard their voices get louder and asked Trina to turn the car radio down, which she did. Brown then heard someone say, "I'm not afraid to die," but did not know who made the statement. Then Brown saw codefendant push the deceased. Neither Williams nor the deceased had anything in his hands. He heard two gunshots. He did not see another person with codefendant and the deceased, but he saw the gun and the hand that held it. The hand with the gun was behind codefendant, between him and the house at least three to four feet behind and at an angle to codefendant. After he heard the two gunshots, Brown ducked and then heard two or three more shots but did not know where they came from.

When he got up, Brown saw some people running through a vacant lot, but did not know who they were or how many there were. No one remained on the sidewalk or on the porch of Williams' house. The deceased was running toward the car. Howard got out of the car and went up to the deceased, who said he had been hit. Howard and Brown helped deceased into the car and drove to the hospital. Brown testified that the deceased did not have a gun when he helped him into the car.

The parties stipulated that if Dr. Tae Lyong, a forensic pathologist who examined Anthony McGruder's body, were called he would testify that Anthony McGruder's death was caused by the gunshot wounds he received.

At the close of the State's case, codefendant Williams' motion for a directed finding was granted and a similar motion by defendant was denied.

Pamela Williams, codefendant's sister, testified for the defense. She stated that she had lived with her brother Vincent and other family members at 1942 West Washburne, on the second floor, for a per-

iod of six years. In January or February 1990, defendant, who is her cousin, came to live with them.

She testified about an incident that took place in January 1990, before the shooting that occurred on February 26, 1990. On that unspecified date in January, she was alone on the front porch of her house when she saw a mob of people following her brother Vincent Williams and cousin Melvin Golden to their house. One of the mob had a shovel, one had an axe and others had sticks in their hands. She recognized four of the group as Trina McGruder (also known as Trina Steward), Martha McGruder, DeWayne McGruder and Calvin McGruder. The deceased was not among them. They were cursing Williams and Golden, who were returning the epithets. Williams and defendant had no weapons. She told Williams and defendant to "just come on and leave it alone." Christopher McGruder, the deceased's brother, stopped the hostilities and sent his sisters and nephews home.

Pamela further testified that on the date of the shooting she was at home. She looked out the window and saw her brother Vincent, her cousin Melvin, the deceased, Anthony McGruder, and Andrew Howard standing on the sidewalk. Williams and the deceased were arguing. She came downstairs and joined two cousins who were standing on the porch. Defendant was standing next to Williams. Andrew was standing to the right of Anthony, the deceased. She saw Trina's car in the street with Ronie Brown in it.

She walked within a foot of the deceased and asked what was happening, but no one answered. Pamela then testified that the deceased was wearing a coat but it was unzipped. She then saw a black gun in the deceased's waistband and said she was going to call the police. As she was walking away she heard shots and ran next door to call the police. She made the call but did not see the shooting. After the shooting, defendant and Williams disappeared, and she had not seen defendant since the night of the shooting.

On cross-examination Pamela testified that she told Detective Harris that she saw the deceased with a gun when Harris came to her grandmother's home at 1948 West Washburne about two months after the shooting.

Finally, defendant testified in his own behalf. He corroborated Pamela's testimony about the hostile incident that occurred in January 1990 between him, his cousin Vincent and several of the McGruders. However, he also stated, as did Pamela, that the deceased was not among the group. He further testified to another hostile confrontation with some McGruders at a neighborhood basketball center, but stated that the deceased was not in that group either. However, he

testified that he and one of the McGruders got into a fist fight on that occasion.

He testified about a third incident in which he and Williams and a third person were fired upon by a group of men as they were on their way to a tavern. He did not call the police, but he got a gun.

Defendant's version of the shooting which occurred on February 26, 1990, was materially different than that testified to by the prosecution witnesses. He testified that he was at the neighborhood basketball center where he met some of the McGruders. No hostilities occurred and the exchange of words was conciliatory in nature. Later, codefendant Williams arrived at the center and he and defendant went home together.

As they approached the house, a car pulled up to defendant's right. He got up on the porch of the building where he and Williams lived, but Williams was off the porch. A woman was driving the car. The deceased got out of the car with some other people. Defendant testified that although he had not had problems with the deceased in the past, he focused his attention on the deceased in particular because he saw a gun when the deceased opened his coat.

The deceased walked up and said he planned to talk to codefendant about a fight with his cousin. The deceased then put a finger up to Williams' head and Williams knocked it off. Defendant then testified that the deceased, whose jacket was open, reached for a gun. Defendant saw the butt of the gun sticking out of the deceased's pants. Williams then pushed the deceased back and the deceased grabbed the gun, saying, "I'll kill you and your cousin [sic]." Defendant was then closer than six to seven feet from the deceased. As the deceased grabbed his gun, defendant reached for his own gun. The deceased fired at defendant and defendant returned the fire. The deceased fired again, defendant covered his face with his left hand. Defendant then fired two shots, and the deceased fired two or three shots. Defendant testified that he was trying to hit the deceased's gun arm, but he could not see the deceased because of the sparks from the deceased's gun. Defendant did not get hit by a bullet, but the deceased was shot in the face and chest. After the shots were fired, both defendant and the deceased turned around and tried to run. Defendant saw the deceased stumble a little, but kept running until he could not see the deceased any more.

Defendant further testified that he ran through a vacant lot where he dropped the gun. He then started up an alley when he saw codefendant Williams come out of a gangway. Williams fell and

defendant asked him if he had been shot. Williams said he was all right, and each man then ran in opposite directions.

A man was following defendant. Defendant fell and the man stopped and asked defendant if he was shot. Defendant got up and ran away. He concluded his testimony by stating that at the time he fled the scene he did not know that Anthony had been killed or even hit. Much later in July of 1990, he turned himself in to the police when he found out that Anthony McGruder had died and that codefendant Williams had been arrested for the shooting.

After hearing closing arguments by both sides, the court found defendant not guilty of first-degree murder, but guilty of second-degree murder. After conducting a sentencing hearing including evidence and argument in aggravation and mitigation, and defendant's statement in allocution, the court sentenced defendant to 12 years' imprisonment. This appeal followed.

I

Defendant contends that because the court made a finding that first-degree murder had not been proved, defendant was entitled to an acquittal. His theory is as follows: second-degree murder requires proof of all the elements of first-degree murder, plus additional proof of one of two mitigating factors, the one relevant to this case being unreasonable belief in the necessity to use deadly force in self-defense. Once the court found that first-degree murder had not been proved, an essential element to the finding of second-degree murder was therefore absent, thus entitling him to an outright acquittal. This argument misperceives the court's finding and the necessary elements of proof required for a conviction of second-degree murder.

First, the court found that defendant intentionally fired the weapon that caused the death of Anthony McGruder on February 26, 1990. That finding contained all the necessary elements of first-degree murder. However, the court went on to say that on the preponderance of the evidence presented, a mitigating circumstance existed that would warrant a finding of guilty of second-degree murder rather than first-degree murder. The State's witnesses all testified that the deceased did not have a gun at the time of the shooting. Defendant and his witness testified to the contrary that Anthony McGrunder had a weapon at the time of his quarrel with codefendant Williams and defendant. The court's finding was obviously predicated upon its determination that the State's witnesses who testified that the deceased had no weapon were more credible than defense witnesses who testified that he had one. Therefore, the court properly concluded that

defendant's belief that it was necessary to use deadly force to defend himself and his cousin was unreasonable, but nevertheless a mitigating factor sufficient to reduce his culpability to second-degree rather than first-degree murder.

The State, however, carried its entire burden of proving beyond a reasonable doubt the existence of each of the elements of first-degree murder and the absence of circumstances at the time of the killing that would justify or exonerate the killing under principles stated in article 7 of the Illinois Criminal Code of 1961. Ill. Rev. Stat. 1989, ch. 38, par. 9—2.

The evidence presented by the State and the defense in addition established by a preponderance of the evidence the mitigating factor of defendant's subjective but unreasonable belief in the need to use deadly force in self-defense thus resulting in the finding of guilty of second-degree murder.

■ Illinois law presumes that a judge conducting a bench trial understands and follows the law. (*People v. Stewart* (1970), 130 Ill. App. 2d 623, 264 N.E.2d 557.) However, this presumption is rebutted when the record affirmatively demonstrates the contrary. (*People v. Francis* (1978), 73 Ill. 2d 184, 383 N.E.2d 161.) Defendant contends that the judge failed to follow the law by failing to first determine whether the State disproved beyond a reasonable doubt that defendant acted in self-defense before considering whether mitigation existed that would reduce the offense to second-degree murder. The record does not support this argument. The statute requires that the State prove beyond a reasonable doubt each element of first-degree murder and, when appropriately raised, *i.e.*, by the defendant or the State's own evidence, the absence of circumstances that would justify or exonerate the killing. The State presented evidence that the deceased was unarmed which the court found sufficient to prove beyond a reasonable doubt that there were no circumstances existing at the time of the killing which justified defendant's use of deadly force in defense of himself and his cousin. The fact that defendant presented contrary evidence that the deceased had a firearm at the time was a conflict resolved by the trier of fact against defendant. Defendant's contention that the court failed to consider defendant's self-defense argument is belied by the record and the court's own finding. It accepts defendant's contention that he acted in self-defense but rejects the argument that it justified or exonerated the killing because the evidence established beyond a reasonable doubt that defendant's use of deadly force was unreasonable.

II

■ Defendant next argues that the second-degree murder statute violates his due process rights because it precludes a trier of fact from finding a defendant who is charged with first-degree murder and claims self-defense to be guilty of second-degree murder. Contrary to defendant's contention, he was found guilty in this case of second-degree murder and thus lacks standing to challenge the constitutionality of the statute because he has not been directly injured or in immediate danger of direct injury by the statute's enforcement. *People v. Esposito* (1988), 121 Ill. 2d 491, 521 N.E.2d 873.

Even if defendant had standing to challenge the constitutionality of the statute, his constitutional argument is not persuasive. Defendant is not required to prove a mitigating factor. A conviction is reduced from first-degree to second-degree murder when a preponderance of the evidence establishes a mitigating factor. (*People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.) This evidence could be provided by the defendant, but it could be established as well by the State. Pattern jury instructions for determining first-degree or second-degree murder state that a defendant is not required to present evidence of a mitigating factor and direct the jury to consider all the evidence to determine the existence of a mitigating factor. Illinois Pattern Jury Instructions, Criminal, Nos. 2.03A, 7.06A (2d ed. Supp. 1989).

Defendant's analogy to the pattern jury instructions found erroneous in *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, is inapt. In *Reddick*, the instructions stated that the State was required to prove mitigating circumstances to reduce murder to manslaughter whereas the applicable law required the State to disprove mitigating factors. Since this case was a bench trial and not a jury trial, instructions were not involved. It is clear from the record, however, that the trial court correctly applied the law in finding defendant guilty of second-degree murder and thus defendant's due process rights were not violated.

Defendant's final due process attack on the statute alleges that it relieves the State of its constitutional burden of proving all elements of first-degree murder by requiring a defendant to prove a mitigating mental state. In support of his argument he relies on *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881. In *Mullaney*, the Supreme Court struck down the Maine murder statute because it required a defendant to prove that he killed with provocation, or malice, an element of the crime under Maine law that was im-

plied. The court held that this statutory scheme was a violation of the due process principles set forth in *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068, because absence of provocation was a part of the definition of malice and thus an element of the crime.

■ The Illinois murder statute does not require the defendant to prove a less culpable mental state to reduce first-degree murder to second-degree murder. (*People v. Newbern* (1991), 219 Ill. App. 3d 333, 579 N.E.2d 583.) Both degrees of murder require intent to kill or knowledge that one's act will cause death or great bodily harm or knowledge that one's act will create a strong probability of death or great bodily harm. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1, 9—2.) The State must prove this element beyond a reasonable doubt. This statute is similar to the New York statute approved by the Supreme Court in *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319. In *Patterson* the State had to prove all the required elements of the crime charged including the mental state. Only then did the statute shift the burden to the defendant to prove by a preponderance of the evidence an affirmative defense of extreme emotional disturbance to reduce the crime to manslaughter from murder. *Patterson*, 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319.

The murder statute in Illinois meets the constitutional requirements that the State must prove all the essential elements of the crime. It is not unconstitutional for the legislature to require a defendant to prove a mitigating factor that would reduce the crime from first- to second-degree murder. *Martin v. Ohio* (1987), 480 U.S. 228, 94 L. Ed. 2d 267, 107 S. Ct. 1098; *McMillan v. Pennsylvania* (1986), 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411; *Patterson*, 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 3219.

Furthermore, the Illinois Supreme Court and numerous appellate court opinions have stated that the murder statute requires the State to prove the essential elements of first-degree under the law now in effect. (*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141; *People v. Mitchell* (1991), 221 Ill. App. 3d 926, 583 N.E.2d 78; *People v. Wright* (1991), 218 Ill. App. 3d 764, 578 N.E.2d 1090; *People v. Willis* (1991), 217 Ill. App. 3d 909, 577 N.E.2d 1215; *People v. Jerome* (1990), 206 Ill. App. 3d 428, 564 N.E.2d 221; *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.) The Illinois Supreme Court stated in *Reddick* that mitigating factors which reduce the crime from murder to manslaughter are not elements of the offense, but are affirmative defenses that do not bear upon the ultimate burden of proof. *Reddick*, 123 Ill. 2d at 196, 526 N.E.2d at 145.

When a defendant is charged with first-degree murder he may choose to present evidence of mitigating factors sufficient to reduce his degree of culpability. The State must still prove all the elements of the crime. Failure to do so exonerates the defendant regardless of whether he presents mitigating evidence, but if he does so, the State must disprove those factors beyond a reasonable doubt. *Buckner*, 203 Ill. App. 3d at 533, 561 N.E.2d at 341.

A defendant charged with second-degree murder is not required to prove anything. The State is required to prove all the elements of first-degree murder and concede the mitigating factors. *Buckner*, 203 Ill. App. 3d 525, 561 N.E.2d 335.

For the reasons set forth above, the murder statute is constitutional.

## III

Finally, defendant argues that his sentence of 12 years' imprisonment was excessive. Imposition of sentence is a matter within the sound discretion of the trial court. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) A reviewing court may reduce a sentence imposed by the trial court only when the record affirmatively shows that the trial court abused its discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

■ Defendant was convicted of second-degree murder, a Class I felony with a maximum sentence of 15 years' imprisonment. The trial court carefully considered the mitigating factors, such as defendant's age of 19 at the time of his arrest for this offense and his lack of a prior serious criminal record.

Aggravating factors were also present and were considered by the court in the case at bar. Defendant and his cousin Vincent Williams had experienced ongoing difficulties with certain members of the McGruder family. Instead of seeking peaceful solutions, defendant's response was to arm himself with a gun. The argument that led to Anthony McGruder's death began as a quarrel between the deceased and defendant's cousin Vincent into which defendant injected himself with tragic consequences. There was no prior history of trouble between defendant and Anthony McGruder. The court recognized a mitigating factor by finding defendant guilty of second-degree murder, based upon defendant's unreasonable belief that the use of deadly force was necessary in defense of himself and his cousin Vincent. Although defendant claimed Anthony McGruder was armed, the prosecution witnesses all testified that Anthony had no weapon and the trial court resolved this conflict against defendant. Under such cir-

cumstances the use of deadly force was neither mature nor responsible. An important factor that a court must consider in sentencing a defendant is the necessity to deter others from committing similar criminal conduct. (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3(a), (f); *People v. Burrett* (1991), 216 Ill. App. 3d 185, 576 N.E.2d 293.) A sentence of 12 years or more has been given in other cases of second-degree murder or voluntary manslaughter. (*People v. Murillo* (1992), 225 Ill. App. 3d 286, 587 N.E.2d 1199; *People v. Fisher* (1989), 186 Ill. App. 3d 255, 542 N.E.2d 1127; *People v. Gaurige* (1988), 168 Ill. App. 3d 855, 522 N.E.2d 1306.) A sentence of 12 years' imprisonment was appropriate to show those who witnessed the violence in this case as well as others that arming oneself with a gun as a means to settle disputes will receive a serious societal response.

For the reasons set forth above, defendant's conviction and sentence are affirmed. As part of our judgment, we grant the State's request and assess defendant $50 as costs for this appeal.

Affirmed.

GORDON, P.J., and COUSINS, J., concur.