THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MAURICE GREEN, Defendant-Appellant.

First District (3rd Division)   No. 1—87—2358

Opinion filed January 16, 1991.

Randolph N. Stone, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Karlene Behringer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN* delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Maurice Green was convicted of murder, aggravated criminal sexual assault and unlawful restraint. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), 12—14(a)(1), 10—3(a).) Defendant was sentenced to an extended term of 60 years' imprisonment for murder, 60 years' ex-

---

*Justice Freeman authored this opinion prior to his election to the Illinois Supreme Court.

tended term for aggravated criminal sexual assault, to run consecutively to the term for murder, and three years' for unlawful restraint, to run concurrently with the term for aggravated criminal sexual assault. Defendant appeals, contending that: (1) the trial court erred in instructing the jury on the proper burdens of proof for voluntary manslaughter; (2) the trial court erred in permitting certain evidence to be taken into the jury room during deliberations; (3) a combination of errors in closing arguments denied him a fair trial; (4) the trial court erred in imposing an extended-term sentence for the aggravated criminal sexual assault conviction; (5) the trial court erred in considering the death of the victim as a factor in sentencing; and (6) since the extended-term sentence of aggravated criminal sexual assault was influenced by defendant's conviction for murder, if a new trial is ordered on the murder charge, the court should order reconsideration of the sentence for aggravated criminal sexual assault. We affirm in part and reverse in part.

The record reveals that on June 7, 1985, at about midnight, defendant visited M.H., the victim, at her apartment in Chicago. The victim shared her apartment with B.J., her 15-year-old daughter, and her stepson, R.J. Defendant and the victim had been friends for about eight years, and he knew both of her children.

Defendant and the victim went into the victim's bedroom, where they shared some cocaine. After using all of the drugs, the couple went out to purchase more. The two separated, and defendant returned to the victim's apartment at about 2:45 a.m. and smoked more cocaine.

At some point during the early morning of the 8th, the victim left the bedroom. While she was out of the room, defendant took a small packet of cocaine and put it in his shirt pocket. When the victim returned, she noticed that a packet was missing. She asked defendant about the missing packet, and he denied having taken it, telling her that she had miscounted the packets. The victim told defendant that he was not leaving until she found the missing packet.

The victim then reached for defendant, in a playful manner, and he pushed her away. The victim reached again and again defendant pushed her away. When the victim reached for him a third time, defendant grabbed a large glass decanter and struck her on the top of her head. The victim fell into his arms and he hit her a couple more times. The victim then fell against the bed and slid onto the floor.

Defendant then sat down on the bed and cooked another packet of cocaine. Moments later, while defendant was seated on the bed, the victim's foot hit his leg. Defendant looked and saw the victim's cheeks

and lips were moving and he heard her moaning. He then picked up a green champagne or wine bottle and hit the victim in the head three or four more times. The bottle broke.

Defendant then left the bedroom, went into the kitchen, got a 7-Up bottle and returned to the victim's bedroom. He removed her .32 caliber handgun from underneath her pillow and went into B.J.'s bedroom. He did not recall whether he struck the victim with the 7-Up bottle.

B.J. testified as follows. On the evening of June 7, 1985, defendant knocked on the door of the apartment and identified himself. B.J. then knocked on her mother's bedroom door and told her of defendant's presence. The victim told B.J. to tell defendant that she was not available. She did not want to be bothered with him.

B.J. eventually allowed defendant to come inside the apartment. Once inside, the victim invited defendant into her bedroom. Later, after B.J. had eaten, she went into her bedroom, closed the door, turned on the radio and went to sleep.

Later, she was awakened by defendant walking in and out of her room. B.J. described that at times, as defendant knelt by her bed, she could see and smell smoke. B.J. did not let defendant know she was awake.

Finally, defendant told her to wake up. She told him to leave her alone, but defendant told her to get up, that he had a gun. Defendant then raised the gun and told her that he didn't want to kill her. On his order, B.J. touched his face. He then told her that he just wanted to put his face between her legs. Defendant continued to point the gun at her as he removed her underpants and put his tongue inside of her vagina. Defendant would leave the room, return and repeatedly sexually assault B.J. B.J. could not remember how many times this had occurred; however, she did remember that it happened more than twice. Once, after leaving the room and returning, defendant told B.J. to lie on her stomach, and he then put his tongue inside of her anus. B.J. recalled that this happened only once.

B.J. also testified that defendant lay on top of her, holding the gun down by his side, and told her to touch him. She complied. During this time B.J. heard her brother R.J. as he was starting to unlock and come in the back door of the apartment. Defendant then got up, ran to door and pushed it closed. R.J. identified himself and asked defendant what was going on. Defendant told R.J. to get away from the door. R.J. left and telephoned the apartment.

B.J. spoke with R.J. on the phone. After speaking with R.J., defendant told her to dial 911. As the 911 service rang, defendant

snatched the phone away from B.J. and he spoke with the person who answered. Subsequently, at about 8 a.m., the police arrived. B.J. spoke with them on the telephone and was told that defendant was going to release her. Until the time that she was released, defendant would not allow her to leave the apartment; he kept her in a closet in the bathroom, leaving the closet door ajar.

After being released B.J. went upstairs to a neighbor's apartment, where she met with the police and R.J. R.J. asked B.J. whether defendant had allowed her to go into her mother's room. B.J. responded negatively. R.J. then told the police that his mother was still in the apartment.

B.J. recalled that at some time during this ordeal she asked defendant about her mother. He responded that the victim had gone out with his money and would return. B.J. identified photographs of the apartment which depicted that defendant had placed a chair in front of the entry into the apartment. She also identified a window in the kitchen of the apartment with two bullet holes shot by defendant.

Officer Dennis Banahan testified that on June 8 he responded to a call at M.H.'s apartment. Upon knocking on the door and identifying his office, defendant told him to get away and that he had a gun. Banahan asked and defendant consented for him to speak with B.J. B.J. was crying and informed Banahan that she was all right. Banahan again attempted to persuade defendant to release B.J.; however, defendant told him to get away from the door. Banahan then went outside the building and contacted the hostage barricade terrorist unit.

Thomas Johnson, a detective with the hostage barricade terrorist incident program, made telephone contact with defendant. Defendant permitted B.J. to speak with him. B.J. told Johnson that defendant was pointing a gun at her. Johnson asked to speak with defendant again. Defendant then took the phone away from B.J. and hung it up.

Several minutes later, Johnson telephoned the apartment again and attempted to persuade defendant to surrender. Defendant told Johnson that he wanted to talk to Mary because she owed him some money. Johnson asked him to release B.J.; however, defendant said that he could not. The telephone conversation lasted several minutes, then defendant hung up.

Johnson made several attempts to telephone the apartment for the next few hours. Finally, at about 8:15 a.m. defendant released B.J. Johnson continued to talk with defendant to convince him to come out. At about 9:15 a.m. defendant came to the rear door of the apartment and threw out the gun. Defendant then told Johnson that

he had killed Mary over cocaine, but he refused to surrender. At about 10:25 a.m., after continued negotiations, defendant came out of the apartment. He was then handcuffed, taken back inside the apartment and given *Miranda* warnings.

Subsequent to defendant's arrest he was taken to the police station, and after again being advised of his rights, he made a statement to Detectives Patrick Carroll and Michael O'Connor of the Chicago police concerning the incident. He subsequently made a second statement to Assistant State's Attorney Mark Schroeder, which Schroeder summarized and defendant signed.

Defendant's first contention is that the jury was improperly instructed on the burden of proof for voluntary manslaughter. He claims that the instruction placed the burden of proof on the State to prove that defendant "acted under a sudden and intense passion resulting from serious provocation by another." He maintains, relying on *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, that placement of the burden on the State rendered the instruction invalid. Therefore, he argues, a new trial on the murder charge is required.

The State neither disputes the claimed error in the instruction nor the retroactive application of *Reddick*. However, the State argues that since there was no evidence to support defendant's theory that he was acting with an unreasonable belief that the killing was justified, the error was harmless. We note, as does defendant in his reply brief, that defendant's theory was not unreasonable belief, as the State here addresses, but serious provocation.

Here, the jury was instructed, without objection, on the then-standard instructions on voluntary manslaughter, *viz.*, that the State bore the burden of proving that when the defendant killed, he acted under a sudden and intense passion resulting from serious provocation by another. Subsequent to defendant's trial, our supreme court, in *Reddick*, held that in order to sustain a murder conviction in cases where the defendant presents sufficient evidence to raise the affirmative defense of voluntary manslaughter based on provocation, the State has the burden of disproving, rather than proving, the existence of provocation and that the jury should be so instructed.

Even assuming that *Reddick* is controlling in this case, we do not believe that a reasonable jury would have found that defendant acted out of serious provocation at the time of this offense. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(1).) Here, the defendant's statement, which was introduced into evidence, described that the victim came toward him, empty handed, and when she grabbed him, he hit her in the head with a decanter. The victim fell on the bed and slid onto the floor. As

the defendant sat on the bed, the victim's leg moved and touched his foot. The defendant jumped up because he thought that the victim was dead. As the victim lay there on the floor, her face and mouth twitching, defendant picked up another bottle and began hitting her again in the head with it.

■■ ■ It is well settled that mutual combat or quarrel can be sufficient to support a finding of serious provocation. (See, *e.g., People v. Crews* (1967), 38 Ill. 2d 331, 335, 231 N.E.2d 451; *People v. Neal* (1983), 112 Ill. App. 3d 964, 967, 446 N.E.2d 270.) However, if the provocation is inadequate (*People v. Matthews* (1974), 21 Ill. App. 3d 249, 253, 314 N.E.2d 15), or if the defendant attacks the victim out of proportion to the provocation, then the crime is murder. (*People v. Hood* (1989), 191 Ill. App. 3d 129, 134, 547 N.E.2d 637; *Neal*, 112 Ill. App. 3d at 968.) Even were we to find that there was provocation, we would nonetheless find that it was in no way in proportion to the manner in which defendant retaliated. After review of the record, we are unable to conclude that the result of trial would have been different if the *Reddick* instruction had been given. (*People v. Fierer* (1988), 124 Ill. 2d 176, 187, 529 N.E.2d 972.) Therefore, we find that any error in the instruction was harmless beyond a reasonable doubt. See, *e.g., People v. Harris* (1989), 132 Ill. 2d 366, 547 N.E.2d 1241, *cert. denied* (1990), 496 U.S. 908, 110 L. Ed. 2d 275, 110 S. Ct. 2594; *People v. Moleterno* (1990), 199 Ill. App. 3d 15, 556 N.E.2d 703; *People v. Skipper* (1988), 177 Ill. App. 3d 684, 533 N.E.2d 44 (supplemental opinion).

Defendant's second contention is that the trial court erred in permitting a vial of the victim's blood and "gruesome autopsy" photographs of the victim to be sent into the jury room during deliberations. He argues that the blood and the photographs needlessly inflamed the emotions of the jurors.

We first address the issue of the photographs. The court, over defendant's objections, allowed 11 color photographs of the victim to go back into the jury room during its deliberations. Contrary to defendant's characterization of the pictures as post-autopsic, the pathologist testified these photographs (exhibits 28, 29, 30, 31, 32, 33, 35, 36, 37 and 38) showed the victim as she appeared at the time of the autopsy. According to him, these photographs depicted the various angles of multiple blunt trauma lacerations and abrasions to the top, front, back and sides of the victim's head. The victim's head had been shaven by the pathologist's staff in order to make the injuries more visible. One photograph, exhibit 37, showed an area on the left side of the victim's head where, according to the pathologist's testimony, the

margin was lifted from the surface; the scalp was separated from the skull. In another photograph, exhibit 41, the victim's scalp had been pulled away from the left side of the skull and fracture lines are visible.

The State maintains that the photographs were introduced to show the victim's wounds and to corroborate the pathologist's testimony. It argues, relying on *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238, and *People v. Montague* (1986), 149 Ill. App. 3d 332, 500 N.E.2d 592, that photographs which establish the various wounds and their locations or which corroborate and explain the pathologist's testimony are admissible.

■■■ " 'It is the rule that where photographs are relevant to establish any fact in issue that they are admissible in spite of the fact that they may be of a gruesome nature.' " (*People v. Foster* (1979), 76 Ill. 2d 365, 377, 392 N.E.2d 6, quoting *People v. Speck* (1968), 41 Ill. 2d 177, 202, 242 N.E.2d 208, *rev'd* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279; see also *People v. Shum* (1987), 117 Ill. 2d 317, 353, 512 N.E.2d 1183, *cert. denied* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108 S. Ct. 1060.) When presented with photographic evidence, the trial court must weigh the probative value and its potential prejudicial effect. (*People v. Greer* (1980), 79 Ill. 2d 103, 117, 402 N.E.2d 203; *People v. Partin* (1987), 156 Ill. App. 3d 365, 509 N.E.2d 662.) The ultimate decision as to what shall be taken into the jury room rests within the sound discretion of the trial court and, absent an abuse of that discretion, its decision will not be disturbed. (*Shum*, 117 Ill. 2d at 353; *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.) Obviously, photographs which have no probative value and no purpose, "other than to horrify the jurors and arouse their emotions against the defendant," should not be admitted. *People v. Coleman* (1983), 116 Ill. App. 3d 28, 36, 451 N.E.2d 973, *cert. denied* (1987), 479 U.S. 1056, 93 L. Ed. 2d 984, 107 S. Ct. 933.

Defendant relies on *People v. Landry* (1977), 54 Ill. App. 3d 159, 368 N.E.2d 1334, to support his argument that photographs taken during an autopsy are highly prejudicial. In *Landry*, "grisly pictures, not of [the] external injury inflicted, but of the autopsy," were shown to the jury. (54 Ill. App. 3d at 161.) The pathologist there testified that the autopsy procedure may have exaggerated the appearance of superficial injury. To exemplify the distortion caused by the autopsy procedure, the pathologist testified that a dark area which appeared on the left side of the decedent's face was actually his nose. The court

concluded that the gruesome nature of the photographs was caused by the autopsy procedure, rather than by an act of the defendant.

Similarly, in *People v. Lefler* (1967), 38 Ill. 2d 216, 221-22, 230 N.E.2d 827, one photograph showed the decedent's chest cavity after the breast bone, a portion of the ribs and the lungs, heart and main blood vessels had been removed. Another photograph showed the skull and portions of the brain after an area of the skull had been removed. The testimony there was that the gruesome nature of the pictures was caused almost entirely by the autopsy procedure. Additionally, the photographs had little probative value in view of the pathologist's detailed testimony and the fact that the nature and extent of the injuries were not disputed. Therefore, the court held that the photographs should not have been admitted. See also *People v. Jackson* (1956), 9 Ill. 2d 484, 138 N.E.2d 528 (photograph which showed sutures of the autopsic incision improperly admitted).

In the present case, the pathologist testified that the cause of the victim's death was the result of head injuries due to multiple blunt traumas. With the exception of exhibit 41, the photographs of the victim's shaven head depicted the condition of the victim as a result of the injuries she sustained, not the autopsy. The trial court stated that it would permit exhibits 37 and 41 to go into the jury room because they were descriptive of the pathologist's search for injuries and corroborated his testimony.

We believe that the exhibits, though gruesome, were probative on the issues of the cause of the victim's death and the force and manner in which the injuries were inflicted. Additionally, the photographs served to corroborate the pathologist's testimony concerning the extent and the nature of the injuries suffered. The fact that exhibit 41 showed the victim as a result of some preliminary autopsic procedure does not necessarily render the photograph prejudicial. (See *People v. Yoho* (1987), 164 Ill. App. 3d 17, 517 N.E.2d 329 (probative value of color photograph depicting a close-up view of the heart and its wound within what appears to be the chest cavity outweighed prejudice); *People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199 (two photographs which showed views of the left and right sides of the victim's head, with a small area around her ear partially shaved, the wounds cleaned and brain fragments near the victim's hair properly admitted).) While we might have disagreed with the trial court on the necessity of submitting some of the photographs, we find no abuse of discretion.

We note that defendant's reliance on *People v. Coleman* (1983), 116 Ill. App. 3d 28, 451 N.E.2d 973, *cert. denied* (1987), 479 U.S. 1056, 93 L. Ed. 2d 984, 107 S. Ct. 933, is misplaced. The photographs in *Coleman* depicted the decedent's decomposing, maggot-infested, partially autopsied body. Several teeth were missing and the brain was exposed, lying next to the head. A rag, which had been lodged in the decedent's mouth, and had caused the suffocation death, had been removed. The reviewing court held that the cause of the decedent's death was not in issue and, moreover, the rag, which caused the suffocation, had been removed from the decedent's mouth.

In the present case, the photographs are not nearly as gruesome as those described in *Coleman*. Additionally, the photographs here, unlike in *Coleman*, depicted the injuries which were the cause of decedent's death. Finally, as we have already stated, the photographs here were probative on the issues of the manner and extent of the victim's injuries.

We next consider the admission of the vial of blood.

In its brief, the State offers no purpose for allowing the vial of blood to go to the jury. Instead, it relies on the trial court's determination that the blood was "descriptive and part of the physical evidence recovered." The State maintains that even if it was error to permit the vial in the jury room during deliberations, such error was harmless.

Defendant maintains that the presence of the blood during the jury deliberations aroused the emotions of the jury so as to compel a rejection of his voluntary manslaughter defense. He relies on *People v. Elwell* (1977), 48 Ill. App. 3d 628, 362 N.E.2d 830, to support his claim of reversible error. We find defendant's reliance on *Elwell* to have been misplaced and, further, we believe that the other evidence, coupled with defendant's post-arrest statement, are what in fact served to discredit his defense of voluntary manslaughter.

Our review of *Elwell* reveals that the evidence there was more closely balanced than in this case. In *Elwell* three men, including the defendant, were involved in a fight with two other men. While the evidence revealed that only the defendant had come in contact with the victim during the melee, no one saw the defendant stab the victim, no one ever saw a knife in the defendant's hand, and no knife or other instrument capable of being used for stabbing was ever found. In this case, defendant made a statement admitting his involvement in the incident and the objects used to kill the victim were recovered from the scene. Moreover, as the State points out, the jury in *Elwell*, unlike here, deliberated over a period of several days.

■ However, merely because evidence is "descriptive and part of the physical evidence recovered" does not bestow upon it any probative value nor does it diminish its potential for prejudice. We fail to see any valid purpose for permitting the vial to be taken with the jury during its deliberations. The blood could not have aided the jury in its deliberations. That notwithstanding, based on the evidence presented defendant was not substantially prejudiced by the error and reversal is not required. See, *e.g., People v. Lee* (1990), 194 Ill. App. 3d 595, 551 N.E.2d 300; *People v. Gonzales* (1979), 79 Ill. App. 3d 498, 398 N.E.2d 647; *People v. Seaberry* (1978), 63 Ill. App. 3d 718, 380 N.E.2d 511.

Defendant's third contention is that as a result of a combination of errors in the State's closing argument he was denied a fair trial. He points to four separate ways in which the comments prejudiced him. Defendant first argues that the State made improper comments concerning the exercise of his constitutional rights and improperly invoked the sympathy of the jury.

The State responds that the issues have been waived for defendant's failure to properly include the objections in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) We have reviewed defendant's motion and find that the issue concerning defendant's constitutional rights has been properly preserved for our review. However, the sympathy argument was raised neither at trial nor in the post-trial motion. Thus it is waived.

The objectional comments are as follows:

"MR. McNERNEY [Assistant State's Attorney]: You also heard a lot about rights. The defendant has a right to a fair and impartial jury. He got one.

MR. McINERNEY [Defense Counsel]: Judge, objection. This is not rebuttal. Objection.

MR. McNERNEY [Assistant State's Attorney]: He has a right to a fair trial. He has a right to be represented by able counsel. He has a right to confront the witnesses, the accusers against him. He has a right to remain silen[t].

MR. McINERNEY [Defense Counsel]: Objection, Judge.

MR. McNERNEY [Assistant State's Attorney]: He has all kinds of rights.

MR. McINERNEY [Defense Counsel]: Objection, Judge.

THE COURT: Objection overruled.

MR. McNERNEY [Assistant State's Attorney]: What about Mary Ann? Don't the victims of crime have any rights? What

about her right to live? He doesn't think anything of that. What about B.J.'s right not to be sexually assaulted in her own home? I don't see him crying about that.

This is nothing more than an attempt to avoid responsibility for what he's done."

■■ ■ The prosecution is permitted wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 445, 521 N.E.2d 38, *cert. denied* (1988), 488 U.S. 871, 102 L. Ed. 2d 156, 109 S. Ct. 187; *People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970.) However, it is critical, during rebuttal argument, that the prosecuting attorney not make improper arguments or assumptions not based on the evidence since, at that point, the defense is without opportunity to respond. (*People v. Heidorn* (1983), 114 Ill. App. 3d 933, 938, 449 N.E.2d 568; *People v. Escobar* (1979), 77 Ill. App. 3d 169, 395 N.E.2d 1028.) When presented with a claim of prosecutorial misconduct, arguments of both the prosecutor and defense counsel must be examined in their entirety, and the complained-of comments must be placed in their proper context. (*People v. McBounds* (1989), 182 Ill. App. 3d 1002, 1015, 536 N.E.2d 1225; *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121.) Absent a clear abuse of discretion, the trial court's determination of the propriety of the argument will stand. *Cisewski*, 118 Ill. 2d at 175; *People v. Harris* (1989), 187 Ill. App. 3d 832, 543 N.E.2d 859.

Having set out the applicable legal principles, we first consider defendant's argument concerning his reliance on his constitutional rights. Defendant claims that the State sought to penalize him for employing his rights, by encouraging the jurors to find that he was using his rights "to avoid responsibility for what he's done."

We have reviewed the arguments of the parties. In its closing, defense counsel, referencing expert testimony, made comments concerning the effects of cocaine abuse. He asked the jury to recall that the effects, among other things, were hallucinations and abnormal behavior. At one point in the argument, counsel stated that defendant was under the effects of cocaine and that that was why he had killed the victim.

■■ The State does not argue, but it appears to us, that the statement concerning defendant's rights did not purport to penalize him for the exercise of those rights. The tenor of the State's argument up to the point of listing defendant's rights was that defendant's reliance on diminished capacity, due to his cocaine use, and his cooperative be-

havior were attempts to avoid the consequences for the offenses committed. In its proper context, we believe that the comment concerning avoiding responsibility related to defense counsel's argument concerning the effects of cocaine use. We do not find, as in *People v. Ray* (1984), 126 Ill. App. 3d 656, 662-63, 467 N.E.2d 1078 (prosecutor stated "this man has hid[den] behind those rights"), that the remark here implied that defendant was taking refuge in his constitutional rights, but rather that he was attempting to use the drug abuse as an excuse. (Compare *People v. Webb* (1986), 143 Ill. App. 3d 427, 493 N.E.2d 52.) We conclude that the remark was proper.

Defendant next argues that comments made by the State prejudiced him in two additional ways. In its rebuttal, the State called defendant a liar, a coward, a thief, a drug abuser, a manipulator, an intimidator, an assaulter of helpless women, a child molester and a murderer. He then stated to the jury, "God help us if you let the guy go that did this to Mary Ann."

Defendant first argues that the State, without basis, repeatedly disparaged his character. He maintains that there was no evidence to support the State's characterization of him. The State responds that its statements about the character of defendant were based on reasonable inferences from the evidence.

■■ Generally it is prejudicial error for a prosecutor to characterize a defendant as a liar. (*People v. King* (1989), 182 Ill. App. 3d 501, 506, 538 N.E.2d 230; *People v. Strange* (1984), 125 Ill. App. 3d 43, 465 N.E.2d 616.) However, such conduct does not constitute reversible error where proof of guilt is supported by substantial evidence. We agree with the State that the characterizations find some support in the record. We point to the evidence that defendant stated that he had taken a packet of the victim's cocaine, then told the victim that she had miscounted. Further, defendant stated that he told B.J. that her mother had taken his money and had left the apartment when, in fact, she lay beaten to death in her bedroom. Moreover, even were we to conclude that the characterization here was error, we would nonetheless find that the overwhelming evidence of defendant's guilt, rather than the negative characterization, resulted in his conviction.

Defendant next argues that the prosecution frightened the jurors into convicting him of murder by drawing assumptions not based on the evidence. He claims prejudice because the jury's option was either to find him guilty of murder or to find him guilty of voluntary manslaughter. He argues that he was not asking the jury to release him, but to find him guilty of voluntary manslaughter.

■■■ The State responds, and we find, that defendant's argument claiming that the verdict was based on fear is not properly preserved for review. Moreover, even if the argument was properly before us, and assuming that the comments carried defendant's assigned meaning, we would find no impropriety. The jury received an instruction on the elements to prove voluntary manslaughter and a verdict form which included an option to find defendant not guilty of both murder and voluntary manslaughter. Thus, had the evidence shown that he was not guilty of either offense, regardless of what defendant asked the jury to find, acquittal on both charges would have been required.

Defendant next contends that the imposition of the extended-term sentence for his aggravated criminal sexual assault conviction was improper. He advances two arguments in support thereof. First, in a supplemental argument, filed in this court prior to oral argument, defendant asserts that since aggravated criminal sexual assault, a Class X offense, is a lesser class offense than murder, he could not be sentenced to an extended term for the aggravated criminal sexual assault.

■■■ Defendant is correct. The statute authorizing extended terms provides, in pertinent part:

> "(a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a).

See *People v. Jordan* (1984), 103 Ill. 2d 192, 203-06, 469 N.E.2d 569; *People v. Holiday* (1985), 130 Ill. App. 3d 753, 474 N.E.2d 1280. Compare *People v. Young* (1988), 124 Ill. 2d 147, 529 N.E.2d 497, and *People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d 845, *cert. denied* (1986), 476 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292 (where capital sentence, as opposed to term of years, for murder imposed extended-term sentence on offense in lesser class permissible).

Second, in his opening brief, defendant maintains that the sentence was improper because the sexual assault was not characteristically brutal or heinous. We agree. However, since we find defendant's first argument to be dispositive, we need not engage in analysis of the second. Pursuant to Supreme Court Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)), we reduce defendant's sentence for the aggravated criminal sexual assault to 30 years, the maximum nonextended-term sentence for that offense. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3).

Defendant's fifth contention is that the trial court improperly considered the victim's death as a factor in sentencing him for murder. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138.) Defendant asks that the sentence be vacated and that the case be remanded for resentencing.

We have reviewed the court's statements during the sentencing phase of defendant's trial. The trial judge gave a lengthy laundry list of the factors which it had considered in determining defendant's sentence. Among the factors, the court stated that it had considered defendant's background, his criminal history, the arguments in mitigation and aggravation, as well as defendant's potential for rehabilitation. Finally, after stating these factors, the court stated:

> "But in imposing the sentence, I am taking into consideration how your conduct caused serious harm, it caused serious harm, the worst possible loss to the victim of the murder, her life was taken."

■■■ ■ While it is proper to consider as an aggravating factor the force employed and the physical manner in which the victim's death was brought about, it is improper to consider the death of the victim as an aggravating factor where the death is implicit in the offense. (*Saldivar*, 113 Ill. 2d at 271-72; *People v. Tompkins* (1987), 155 Ill. App. 3d 380, 508 N.E.2d 481.) However, as was stated in *People v. Martin* (1983), 112 Ill. App. 3d 486, 445 N.E.2d 795, it is unrealistic to suggest that the judge in sentencing the defendant must avoid mentioning the fact that someone has died or risk committing reversible error.

The State distinguishes *Saldivar*, noting that there the harm caused was the primary aggravating factor considered, while in this case other factors were considered. The State also distinguishes *Tompkins* on the basis that the trial court there considered the victim's death, "in and of itself," as an aggravating factor.

In this case we have the trial court's express statement that it was considering the death of the victim. The court erred. However, consideration of an improper aggravating factor in sentencing does not always require remandment; resentencing is only required where the reviewing court is unable to determine the weight given to the improper factor. (*People v. Bourke* (1983), 96 Ill. 2d 327, 332, 449 N.E.2d 1338; *People v. Watts* (1990), 195 Ill. App. 3d 899, 552 N.E.2d 1048.) We have examined the trial court's sentencing comments in their entirety. Notwithstanding the error, we believe that any consideration given to the improper factor was insignificant and that the

sentence imposed was neither excessive nor inappropriately enhanced as a result.

In making this determination we consider that the court did give due consideration to the other factors presented in aggravation, including the extremely brutal nature of the offense. Further, defendant's statement, in his presentencing investigation, that he "never wanted to be treated" for his chronic cocaine abuse, strongly indicates that the potential for his rehabilitation is minimal at best. Based on the facts in this case and for the reasons stated, we decline remandment for reconsideration of the sentence.

Finally, defendant's sixth contention is that since the extended-term sentence for aggravated criminal sexual assault was influenced by the murder conviction, if a new trial is ordered on the murder charge, the court should order reconsideration of the sentence for aggravated criminal sexual assault.

Our determination that the murder conviction was proper and further, our vacature of defendant's extended-term sentence for the aggravated criminal sexual assault conviction obviates the need for us to consider this argument.

For the foregoing reasons, we affirm in part and reverse in part.

Affirmed in part; reversed in part.

RIZZI and WHITE, JJ., concur.