THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DIONTA THOMPSON, Defendant-Appellant.

First District (1st Division)   No. 1—03—1899

Opinion filed December 13, 2004.

580

Michael J. Pelletier and Scott F. Main, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Manny Magence, and William M. Blumthal, Jr., Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

After a bench trial, defendant, Dionta Thompson, was convicted of first degree murder and sentenced to 20 years in prison. The court further sentenced defendant to a consecutive 25-year prison term for personally discharging the firearm that caused the victim's death. On appeal, defendant contends that: (1) his conviction for first degree murder should be reduced to second degree murder because the evidence at trial established that at the time of the killing, he acted under a sudden and intense passion resulting from a serious provocation of mutual quarrel or combat; (2) his add-on sentence of 25 years should be vacated because the sentence-enhancing provision (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2002)), mandating the addition of 25 years to natural life to the sentence of any defendant convicted of first degree murder who personally discharges the weapon that causes severe injury or death to another person (sentence-enhancing provision), should be interpreted to apply only in cases where the basis for the enhancement is something other than the murder victim's death; (3) the sentence-enhancing provision is unconstitutional because it amounts to additional punishment for an element which is inherent in the offense itself—namely, causing death to another person—thus violating the prohibition against double enhancement; (4) the sentence-enhancing provision is unconstitutional because it does not bear a reasonable relationship to the public interest of punishing the risk that firearms pose to others when used during the commission of murder; and (5) the mittimus should be corrected to reflect one conviction for first degree murder where there was only one murder victim. For the reasons that follow, we affirm and order the mittimus corrected.

## BACKGROUND

The record shows that in the early morning hours of September 29, 2001, in a public housing complex known as Rockwell Gardens, a series of arguments took place between defendant, age 18, and the murder victim, Deon Fleming, age 17. During the final confrontation, defendant drew a gun and shot Fleming twice.

Sometime before midnight on September 28, 2001, Fleming and his cousin, Huell Lamont Collier, age 28, drove to Rockwell Gardens. Collier testified as follows. While standing in the courtyard area behind one of the buildings, he and Fleming encountered defendant. After sharing some food and a brief conversation, defendant walked into the building, while Fleming and Collier walked to a store across the street to buy alcohol. Upon returning, they learned that Fleming's half sister, Melissa Brown, was having a birthday party in her apartment on the ninth floor and went upstairs. Fleming went inside Brown's apartment, while Collier remained outside in the hallway, talking with defendant and another man. The door of the apartment was open, and Fleming went back and forth between the apartment and the hallway a few times. At some point, Fleming came out into the hallway, joined the men and began drinking with them. Soon defendant and Fleming began to argue and call each other names. Collier got between them, pushed them apart and told them to stop arguing. Collier and Fleming then left the building and went back to the store across the street to buy more alcohol. As noted below, defendant later admitted that he then left to get a gun and returned to the party.

Collier further testified that after he and Fleming left the store, he stopped to talk with friends, while Fleming went back into the building. A short time later, someone on the ninth floor yelled down to Collier to "come get [his] cousin." Collier ran upstairs and saw defendant and Fleming arguing again. According to Collier, both defendant and Fleming had been drinking. Although Fleming consumed more alcohol than defendant, both were "acting wild." Collier got between defendant and Fleming and attempted to calm them down. Defendant and Fleming kept calling each other names and then Fleming reached around Collier and punched defendant in the face. Defendant responded by drawing a revolver and shooting Fleming. Fleming fell to the floor. Collier grabbed at defendant and the gun and succeeded in pushing defendant away from Fleming. Collier stated that defendant then "stood over and shot [Fleming] again."

Brown testified that she heard the argument outside her apartment, went to the open door and looked out. Defendant was calling Fleming names, and Collier was standing between the two men, attempting to calm them down. Fleming then took a swing at defendant and hit him in the jaw. Defendant pulled out a gun. When she saw the gun, Brown closed the door of her apartment. She heard a gunshot and opened the door to find Fleming lying facedown on the floor and Collier trying to push defendant away from Fleming. Defendant reached with his hand around Collier, shot Fleming again and fled.

After being arrested, brought to Area 4 police headquarters and

given his *Miranda* rights, defendant gave several oral statements to Detectives Gregory Baiocchi and Joseph Botwinski and a videotaped confession to Assistant State's Attorney (ASA) Andrew Weisberg and Detective Baiocchi. The videotaped statement was introduced into evidence.

Detective Baiocchi testified that defendant told him that he first had a confrontation with Fleming when he bumped into him in the stairway. They exchanged words about one of the young women at the birthday party and shoved each other. Approximately 20 minutes later, on the ninth floor of the building, the two had a second confrontation. When Fleming and Collier left, defendant went to get a gun and returned to the ninth floor of the building. With respect to the final confrontation, defendant told Detective Baiocchi that he shot Fleming after seeing him make a move to his right side, as if to reach for a gun, and he shot Fleming the second time while he was falling. Defendant also told Detective Baiocchi that he heard that Collier had robbed a dice game in the building at gunpoint earlier that evening. Defendant later told Detective Botwinski that he made up his statements about seeing Fleming reach for the weapon and about Collier having a weapon because he thought it would help his case.

In his videotaped confession, defendant again stated that after Fleming and Collier left the party, he left in order to get a gun because he did not want Fleming or Collier to push him around. According to defendant, after Collier and Fleming returned to the hallway outside Brown's apartment, they came to stand on each side of defendant and began to talk "in [his] ear." Defendant was about to walk off, when Collier grabbed his arm and he and Collier started to wrestle. Defendant claimed he was able to break free, but then he turned and saw Fleming coming toward him. It was at this point that defendant pulled out the gun and shot Fleming in the stomach and, as Fleming fell back, shot him again.

At the bench trial, in addition to the foregoing testimony and statements, the parties introduced the report of a forensic pathologist that Fleming sustained two gunshot wounds to the back, one wound on his left side and one wound on his right side, with both bullets traveling from back to front and slightly upwards. A toxicology screen performed on Fleming's body was negative for cocaine and opiates, but positive for alcohol. The cause of death was multiple gunshot wounds and the manner of death was homicide.

The trial judge found defendant guilty of first degree murder and of personally discharging the firearm that caused the victim's death. The judge rejected defendant's assertions that the shooting was in self-defense or, at most, constituted second degree murder based upon

an unreasonable belief in self-defense. After stating that he considered all the arguments in aggravation and mitigation, the judge sentenced defendant to 45 years of incarceration—20 years for first degree murder and 25 years for personally discharging the firearm that caused the death, to be served consecutively. During sentencing, the judge stated that he had no discretion to sentence defendant to a term of less than 45 years because the legislature mandated a minimum sentence of 45 years for first degree murder by the use of a firearm. Defendant now appeals from his conviction and sentence.

## ANALYSIS

Defendant first contends that his conviction for first degree murder should be reduced to second degree murder because the evidence at trial established that, at the time of the killing, he was acting under a sudden and intense passion resulting from a serious provocation of mutual quarrel or combat.[1]

To give proper context to the specifics of defendant's contention, an overview of the applicable statutory scheme is in order. Effective July 1, 1987, the legislature amended the Criminal Code of 1961 (Criminal Code) (now 720 ILCS 5/1—1 *et seq.* (West 2000)), in pertinent part, by renaming the offense of murder to first degree murder and abolishing the offense of voluntary manslaughter and substituting for it the offense of second degree murder.[2] See *People v. Jeffries*, 164 Ill. 2d 104, 111 (1995). What remained unchanged is the underlying view of what is now known as second degree murder, formerly voluntary manslaughter, as "[first degree] murder plus mitigation"—meaning that the presence of mitigating factors does not negate any element of first degree murder, but operates to reduce the seriousness of the offense and the severity of the punishment. (Emphasis omitted.) *Jeffries*, 164 Ill. 2d at 121. Our supreme court made it clear that first degree and second degree murder each require the same mental state, either intent or knowledge, and it is the presence of statutory mitigating factors that reduces an unlawful homicide from first degree to second degree murder, not the absence of an intent to kill. *Jeffries*, 164 Ill. 2d at 122. The court, therefore, clarified that second degree murder is not a lesser included offense of first degree murder but rather is more accurately described as a lesser mitigated offense of first degree murder. *Jeffries*, 164 Ill. 2d at 122. Still valid

---

[1]Defendant does not ask us to review the trial court's finding that he failed to prove his theory of unreasonable belief in self-defense.

[2]Also modified was the allocation of burdens of proof on the State and on the defense. See *People v. Jeffries*, 164 Ill. 2d 104, 113-14 (1995). That burden-shifting framework is discussed below.

today is an earlier pronouncement by the supreme court that the offense now known as second degree murder is "an acknowledgement by the law of the mitigating effect of human weakness and intense passion in an otherwise unjustified homicide." *People v. Leonard*, 83 Ill. 2d 411, 420 (1980).

We now turn to the language of the current Criminal Code defining the offenses of first and second degree murder. Section 9—1 of the Criminal Code defines the offense of first degree murder, in pertinent part:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9—1 (West 2002).

Section 9—2 of the Criminal Code defines the offense of second degree murder, in pertinent part:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed ***; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code." 720 ILCS 5/9—2 (West 2002).

■ Thus, the second degree murder statute requires the State to prove, beyond a reasonable doubt, each element of first degree murder before the burden shifts to the defendant to prove, by a preponderance of the evidence, any of the factors in mitigation that must be present to reduce the offense from first degree to second degree murder. *Jeffries*, 164 Ill. 2d at 114, 119. Once the defendant carries his burden of proving any of the factors in mitigation, the burden shifts back to the State to prove the absence of the implicated mitigating factors beyond a reasonable doubt. *People v. Golden*, 244 Ill. App. 3d 908, 919 (1993); *People v. Buckner*, 203 Ill. App. 3d 525, 535 (1990). A conviction must be reduced from first to second degree murder if a trier of fact, having considered all such evidence presented by the defense and the State, finds that the defense succeeded in proving the existence of at least one mitigating factor by a preponderance of the evidence. *Golden*, 244 Ill. App. 3d at 917.

We now turn to defendant's argument that he met his burden of establishing that he acted under a sudden and intense passion resulting from a serious provocation of mutual quarrel or combat and, therefore, his conviction should be reduced from first degree to second degree murder. The State argues that defendant waived the consideration of this issue for review because the only mitigating theory defense counsel argued at trial was an unreasonable belief in self-defense, and defendant did not raise the theory of serious provocation in his posttrial motion. Our review of the record reveals that defense counsel emphasized that Fleming was intoxicated and "acting wild"; angry words were repeatedly exchanged between Fleming and defendant over the affections of a young woman at the party; and, before the two fatal shots, Fleming punched defendant in the face. However, the thrust of defense counsel's closing argument was that defendant committed "a series of mistakes"—specifically, getting a gun and bringing it to the party and unreasonably believing that he was being attacked and taking the first shot. Defense counsel summarized his argument as follows:

"Kid's drinking, unsupervised for hours at a party in the projects; threats are made, pushes, shoves, punches, gunshots. That adds up, in his mind, to self-defense.

If the Court finds that *** is an unreasonable belief, perhaps second degree murder. This is not first degree murder."

As the State points out, defendant also did not raise the theory of serious provocation in his posttrial motion.

Defendant responds that his challenge is to the sufficiency of the evidence and that such a challenge is not subject to the waiver rule. As discussed, under the burden-shifting framework involved, the

burden of proof is initially on the State with respect to each element of the first degree murder charge. The burden then shifts to the defendant to prove any of the factors in mitigation and, if the defendant succeeds, back to the State to disprove any such mitigating factors. *Golden*, 244 Ill. App. 3d at 919. Therefore, the question as to whether the evidence favoring mitigation shifted the burden to the State and, consequently, whether the evidence presented by the State was sufficient to overcome such mitigation should be considered on its merits. See *People v. Cowans*, 336 Ill. App. 3d 173, 176 (2002) (challenge to the sufficiency of the evidence is a recognized exception to the waiver rule and may be raised for the first time on appeal).

Defendant argues that the evidence presented at trial established that the shooting occurred during the heat of a physical fight in which Fleming participated "willingly and vigorously"; defendant was not the initial aggressor, and he shot Fleming only after a number of escalating altercations between the two and after Fleming punched defendant in the face. Defendant asserts that the applicable standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. This is not the correct standard of review in regard to whether defendant successfully proved any mitigating factors. As discussed above, the elements of first degree and second degree murder are identical, and it is the presence of statutory mitigating factors that reduces an unlawful homicide from first degree to second degree murder. In the context of a challenge to the sufficiency of the evidence to prove a mitigating factor, the test is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were *not* present. *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996).

We now proceed to consider the merits of defendant's argument. Although defendant may have been acting under a sudden and intense passion,

> "[p]assion on the part of the slayer, no matter how violent, will not relieve [him] from liability for [first degree] murder unless it is engendered by a provocation which the law recognizes as being reasonable and adequate." *People v. Austin*, 133 Ill. 2d 118, 125 (1989).

To constitute such adequate provocation, the defendant must show that the provocation fit within certain recognized categories, such as substantial physical injury, substantial physical assault, or mutual quarrel or combat. *Blackwell*, 171 Ill. 2d at 358. Defendant here relies on the mutual quarrel or combat category.

Our supreme court defines mutual combat as

"a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *Austin*, 133 Ill. 2d at 125.

The State argues that, if one accepts defendant's version of the events, there was no mutual combat between defendant and Fleming. As noted, defendant stated that he was wrestling with Fleming's cousin Collier, and then, as he broke free, saw Fleming coming toward him and shot him. Defendant did not mention that Fleming struck him or there was any sort of physical contact between him and Fleming.

Defendant, however, points to the testimonies of Collier and Brown that, immediately prior to his firing at Fleming, Fleming had punched him in the face. Defendant appears to contend that his own statement, relied upon by the State, should be properly understood to supplement the testimonies of Collier and Brown to the effect that after being hit in the face by Fleming, defendant broke free from Collier's grip and fired at Fleming, who was coming toward him.

The State, in the alternative, argues that defendant's mitigation theory was defeated by the evidence that his retaliation was disproportionate to Fleming's conduct. Where the defendant retaliates "completely out of proportion" to the provocation, especially if he kills the victim with a deadly weapon, the mutual combat aspect of provocation does not apply. *Austin*, 133 Ill. 2d at 127. The State compares the facts of the instant case to those in *Austin* and *People v. Pugh*, 187 Ill. App. 3d 860 (1989), and urges us to reach the same conclusion as in those cases that the retaliation here was wholly disproportionate.

In *Austin*, the defendant boarded a city bus without paying full fare and attempted to unlawfully take a bus transfer. *Austin*, 133 Ill. 2d at 121-22. The driver spoke gruffly to the defendant and prevented the theft of the transfer by hitting the defendant on the hand with a transfer punch. *Austin*, 133 Ill. 2d at 122. The defendant retaliated by striking the driver in the face. *Austin*, 133 Ill. 2d at 122. The driver arose from her seat and began to exchange blows with the defendant for some 30 to 40 seconds. *Austin*, 133 Ill. 2d at 122. The defendant then pulled out a gun. *Austin*, 133 Ill. 2d at 122. The two proceeded to struggle over the gun and, during that struggle, the driver forced the defendant off the bus and exited the bus herself. *Austin*, 133 Ill. 2d at 122. A short while later, the defendant shot and killed the bus driver. *Austin*, 133 Ill. 2d at 122.

The court in that case first noted that the defendant instigated the combat by attempting to wrongfully use the bus services, and the bus driver's response to the defendant's illegal act was not a willing

entry into the combat that followed. *Austin*, 133 Ill. 2d at 126. The court additionally found that the shooting of the unarmed driver was an act completely out of proportion to the provocation, namely, the driver speaking gruffly to the defendant, striking her on the hand with the transfer punch and, at the most, engaging in a fairly even fistfight for 30 to 40 seconds and forcing the defendant off the bus. *Austin*, 133 Ill. 2d at 127.

In *Pugh*, the defendant and the victim were riding in the car together with an individual named Hunter. *Pugh*, 187 Ill. App. 3d at 864. The defendant stopped the car, walked to the passenger door, opened it and asked the victim for money that belonged to the defendant. *Pugh*, 187 Ill. App. 3d at 864. The victim, according to Hunter's testimony said, " 'What?' " and got out of the car. *Pugh*, 187 Ill. App. 3d at 864. The defendant and the victim exchanged blows for a few minutes; according to the defendant, the victim landed three punches on the defendant, blurring his vision and causing him to stagger, but not breaking his skin. *Pugh*, 187 Ill. App. 3d at 866. Hunter broke up the fight and restrained the victim. *Pugh*, 187 Ill. App. 3d at 864, 866. The defendant then ran to the car, retrieved a gun and began to fire at the victim, who was unarmed. *Pugh*, 187 Ill. App. 3d at 864, 866. According to Hunter, the victim started to back away, then turned and attempted to run away. *Pugh*, 187 Ill. App. 3d at 864-65. The first and second shots hit the victim in his side, and the third and fourth shots struck his back. *Pugh*, 187 Ill. App. 3d at 866. After the victim fell to the ground, the defendant approached him. *Pugh*, 187 Ill. App. 3d at 865. The victim pleaded for his life, but the defendant shot him again, then reached into the victim's pocket and retrieved some money. *Pugh*, 187 Ill. App. 3d at 865.

The court in *Pugh* doubted the existence of mutual combat, given the evidence that the fight ceased when Hunter intervened and separated the combatants. *Pugh*, 187 Ill. App. 3d at 868. The court further found that, even assuming mutual combat had occurred between the defendant and the victim at the crucial time, defendant's response of shooting the victim was not proportionate to the provocation, especially in light of the evidence that the victim was unarmed, was shot twice in the back as he attempted to flee, and was shot the final time while on the ground pleading for his life. *Pugh*, 187 Ill. App. 3d at 869.

■ In the instant case, when the shooting first commenced, there was mutual combat. According to the testimonies of Collier and Brown, Fleming, who reached around Collier and punched defendant in the face, entered the combat willingly. However, after Fleming was first shot and down on the floor, an event interceded and defendant was

pushed away from Fleming. Even if we were to consider the second shot to have been fired during mutual combat, the outcome would not change because defendant's response was wholly disproportionate to the provocation. Similar to the evidence in *Pugh*, the evidence in the instant case showed that defendant shot the unarmed victim twice in the back, with the second, final shot delivered when Fleming was lying facedown on the floor. The provocation here, consisting of angry words and one punch to the face, was even less than the provocation in *Pugh*, where the victim punched the defendant three times.

Defendant offers no response to the assertion that his reaction was wholly disproportionate to the provocation. In his reply brief, defendant cites to *People v. Green*, 209 Ill. App. 3d 233, 240 (1991), for the mere proposition that mutual combat or quarrel can be sufficient to support a finding of serious provocation. However, the court in *Green* ultimately found that the alleged provocation of the victim reaching for the defendant in a playful way was in no way proportional to the manner in which the defendant retaliated by repeatedly hitting the victim in the head with a glass decanter and then a glass wine bottle. *Green*, 209 Ill. App. 3d at 236-37, 240. Lastly, defendant's principal supporting cases, *People v. Johnson*, 4 Ill. App. 3d 249 (1972), *People v. Goolsby*, 45 Ill. App. 3d 441 (1977), and *People v. Stepheny*, 76 Ill. App. 2d 131 (1966), do not address the issue of grossly disproportionate retaliation as negating the mutual combat aspect of provocation.

Accordingly, we agree with the State that a rational trier of fact, viewing the evidence in its totality, could find that defendant's retaliation was grossly disproportionate to the provocation, thus defeating his mitigation theory.

■ We next address defendant's arguments relating to his sentence. Defendant first contends that his 25-year add-on sentence should be vacated because the sentence-enhancing provision (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2002)), mandating the addition of 25 years to natural life to the sentence of any defendant convicted of first degree murder who personally discharges the weapon that causes severe injury or death to another person, should be construed to apply only in cases where the basis for the enhancement is not the murder victim's death but rather severe injury or death of another person. The sentence-enhancing provision states:

> "[I]f, during the commission of the offense [of first degree murder], the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death *to another person*, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed

by the court." (Emphasis added.) 730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2002).

Defendant urges that the language "another person" does not refer to the actual murder victim and, therefore, the sentence-enhancing provision requires another victim to form the basis for the enhancement. Defendant argues that under the contrary interpretation, the causing of "great bodily harm, permanent disability [or] permanent disfigurement" becomes superfluous language, given that there needs to be a murder victim in order to trigger the sentencing enhancement. The State maintains that the term "another person" refers to someone other than the person who discharged the firearm, and the sentence-enhancing provision was meant to apply in all cases where a firearm seriously injures or kills someone other than the person who discharged the firearm; not just in cases where there was, in addition to the murder victim, a bystander who was injured or killed.

The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature. *People v. Whitney*, 188 Ill. 2d 91, 97 (1999). The best means of expounding the legislative intent is the statutory language itself. *Whitney*, 188 Ill. 2d at 97. Thus, "[w]here the statutory language is clear, it will be given effect without resort to other aids for construction." *People v. Hickman*, 163 Ill. 2d 250, 261 (1994). Questions of statutory construction are reviewed *de novo*. *People v. Davis*, 199 Ill. 2d 130, 135 (2002).

We agree with the State. The language of the sentence-enhancing provision is clear. The enhancement applies when "the person [who] personally discharged a firearm" causes severe injury or death to "another person," referring to any person other than the one who personally discharged the firearm, rather than any person other than the victim. There could be no question that this language, in context, covers with a single sentence both the murder victims and all others, aside from the shooter, in the vicinity who were seriously injured or killed.

Defendant contends that if the "death to another person" clause of the sentence-enhancing provision is satisfied by the death of the subject murder victim, the sentence-enhancing provision would be unconstitutional because it would amount to additional punishment for an element which is inherent in the offense itself—namely, the causing of death to another person—thus violating the prohibition against double enhancement. The State maintains that it is defendant's use of a firearm to cause the victim's death, not the death itself, that rendered defendant eligible for the sentence enhancement.

Where the constitutionality of a statute is at issue, our review is *de novo*. *People v. Malchow*, 193 Ill. 2d 413, 418 (2000). Double

enhancement occurs when a single factor is used both as an element of the crime and as an aggravating factor justifying the imposition of a harsher sentence than may have otherwise been imposed. *People v. Moss*, 206 Ill. 2d 503, 533 (2003).

There is no double enhancement here. Firearm use is not inherent in the offense of first degree murder. See 720 ILCS 5/9—1(a) (West 2002). It is when first degree murder is committed by discharging a firearm that the sentence is enhanced. In this respect, the first degree murder sentencing statute reflects the pattern contemporaneously established with regard to several other serious felony offenses, similarly enhancing the punishment for firearm use during the commission of these offenses. See, *e.g.*, *Moss*, 206 Ill. 2d at 514. These enhancements have been referred to as the "15/20/25-to-life" provisions. See *Moss*, 206 Ill. 2d at 514. This court has recently addressed and rejected the double enhancement challenge to the "25-to-life" sentence-enhancing provision at issue. See *People v. Sawczenko-Dub*, 345 Ill. App. 3d 522, 537-39 (2003) (it is the use of the firearm to cause the death of the victim that triggered the enhancement, not the death itself); *People v. Bloomingburg*, 346 Ill. App. 3d 308, 325-26 (2004) (it is the manner of death, that it occurred as a result of a discharge of a firearm, rather than the fact of death, that is the focus of the enhancing provision).

Defendant, in the alternative, argues that the foregoing interpretation of the sentence-enhancing provision would be unconstitutional because the extended range of the provision would purport to punish the potential harm that could result from the use of the firearm more harshly than the actual harm, namely, death, and, accordingly, would violate the due process and the proportionate penalties clauses of the Illinois Constitution (Ill. Const. 1970, art. I, §§ 2, 11). Defendant points out that he was sentenced to 20 years for the underlying offense of first degree murder, and his sentence was enhanced by 25 years for causing the death with a firearm. Defendant further points out that the sentencing range for the underlying offense of first degree murder is 20 to 60 years (730 ILCS 5/5—8—1(a)(1)(a) (West 2002)), while the mandatory enhancement range for causing death with a firearm is 25 years to natural life (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2002)), which exceeds the sentencing range for the underlying offense itself. The State maintains that the sentence enhancement is reasonably related to the goal of deterring the use of firearms during the commission of murder, does not give rise to a proportionate penalties violation and is, therefore, constitutional.

In addressing constitutional issues, courts are guided by well-established principles of constitutional law. First and foremost, it is

the legislature's function and role to declare and define criminal offenses and to determine the nature and extent of punishment for their commission in order to protect the interests of society. *People v. Steppan*, 105 Ill. 2d 310, 319-21 (1985). This function includes mandatory sentencing schemes. *People v. Hill*, 199 Ill. 2d 440, 447 (2002). Generally, in order to survive a due process and proportionate penalties challenge, the penalty must be " 'reasonably designed to remedy the evils that the legislature has determined to be a threat to the public health, safety, and general welfare.' " *People v. Lombardi*, 184 Ill. 2d 462, 469 (1998), quoting *Hickman*, 163 Ill. 2d at 259.

It is recognized that the presence of a weapon enhances the danger that any felony that is committed will have deadly consequences should the victim offer resistance. *Lombardi*, 184 Ill. 2d at 470. The purpose underlying the sentence-enhancing provision at issue is to deter the use of firearms in the commission of murder. *Sawczenko-Dub*, 345 Ill. App. 3d at 530. This court previously upheld the constitutionality of the sentence-enhancing provision, recognizing, as other courts have, that severe punishment is warranted for the use of a firearm during the commission of murder because firearms allow a perpetrator to kill the victim effortlessly and are dangerous to others in the vicinity. See *Sawczenko-Dub*, 345 Ill. App. 3d at 530-32; accord *Bloomingburg*, 346 Ill. App. 3d at 322-24; *People v. Moore*, 343 Ill. App. 3d 331, 343-47 (2003).

Defendant, nevertheless, argues that his add-on sentence cannot stand under the decisions of our supreme court in *People v. Bradley*, 79 Ill. 2d 410, 418 (1980) (violation of due process to punish possession of a controlled substance more severely than its delivery), *Moss*, 206 Ill. 2d at 520-31 (mandatory 15-year enhancement for a possession of a firearm and 20-year enhancement for personal discharge of a firearm violated the proportionate penalties clause with regard to the underlying offenses of armed robbery, aggravated kidnaping, and aggravated vehicular hijacking because the less serious conduct involving possession and discharge of a firearm is punished more harshly than the more serious similar offenses which expressly require possession or use of firearms, specifically the offenses of aggravated battery with a firearm and aggravated discharge of a firearm), and *People v. Morgan*, 203 Ill. 2d 470, 490-92 (2003) (the sentencing ranges created by the attempted first degree murder statute and its sentence-enhancing provisions violated the proportionate penalties clause because under the resulting scheme, where mitigating circumstances exist, the penalty for an attempt to commit murder involving the use of a firearm would always be greater than the penalty for successfully committing the underlying offense, *i.e.*, second degree murder).

594

Plaintiff's reliance on the foregoing cases is misplaced because these cases are clearly distinguishable, as this court recognized in *Sawczenko-Dub* and *Moore*. *Sawczenko-Dub*, 345 Ill. App. 3d at 526, 532; *Moore*, 343 Ill. App. 3d at 347. In *Sawczenko-Dub*, this court noted that the supreme court in *Moss* rejected such a constitutional challenge and adopted the finding of the circuit court that there is no unconstitutional disproportionality in the 25-years-to-natural-life sentence enhancement to the underlying offense of armed robbery with personal discharge of a firearm causing great bodily harm. *Sawczenko-Dub*, 345 Ill. App. 3d at 526-33, citing *Moss*, 206 Ill. 2d at 532. Similarly, the supreme court in *Morgan* stated:

"[W]e cannot say that, where mitigating circumstances are not present, it would be cruel, degrading or so wholly disproportionate to the offense committed to subject a defendant who commits the offense of attempted first degree murder to [a] mandatory add-on sentence[ ] of *** 25 years to life ***." *Morgan*, 203 Ill. 2d at 488.

Accordingly, if the 25-year-to-natural-life sentence enhancement can be upheld with respect to the underlying offense of armed robbery with personal discharge of a firearm causing great bodily harm and the underlying offense of attempted first degree murder, it can certainly be upheld with respect to the more serious offense of first degree murder.

■ Defendant's final claim pertains to the accuracy of the mittimus. Defendant was originally charged with six alternative counts of first degree murder. As noted, at the conclusion of the trial, the judge found defendant guilty of first degree murder of Fleming and of personally firing the gun that killed Fleming. The judgment was entered on two separate counts: count I for knowingly shooting and killing Fleming while armed with a firearm, and count III for knowingly shooting and killing Fleming while armed with a firearm, and for personally discharging a firearm during the commission of the offense causing the death of Fleming. Defendant contends that the 25-year add-on sentence is a sentencing enhancement and should not be treated as a separate count and sentence. The State agrees that the mittimus should be corrected to reflect one conviction of a single count of first degree murder, where defendant personally discharged the firearm that caused Fleming's death, and a single aggregate sentence of 45 years. Pursuant to our authority under Supreme Court Rule 615(b)(1) (134 Ill. 2d R. 615(b)(1)), we direct the clerk of the circuit court to correct the mittimus to reflect one conviction of first degree murder and a 45-year sentence of imprisonment.

For the reasons set forth above, we affirm the judgment of the trial court and order the mittimus corrected.

Affirmed; mittimus corrected.

CAHILL, P.J., and McBRIDE, J., concur.