**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200342-U

Order filed September 16, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0342 Circuit No. 19-CF-596 |
| | ) | |
| DENISE L. WILLIAMS, | ) ) | Honorable Albert Purham, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Presiding Justice O'Brien and Justice Hauptman concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  (1) The evidence was sufficient to find the defendant guilty of second degree murder. (2) The court did not err in sentencing the defendant.

¶ 2    The defendant, Denise L. Williams, appeals from her conviction of second degree murder, arguing that the evidence was insufficient to find her guilty beyond a reasonable doubt and the court considered improper factors when sentencing her to 10 years' imprisonment.

¶ 3                                    I. BACKGROUND

¶ 4        On September 23, 2019, the defendant was charged with first degree murder for shooting and killing Jaylin Williams with a handgun the previous day. The case proceeded to a jury trial on June 29, 2020. Officer Saul Espinal testified that he was dispatched to a fight at the intersection of West Starr Street and Griswold Street at approximately 12:24 p.m. When he arrived in the area, multiple people were running towards him saying someone had been shot. He parked his vehicle and proceeded on foot. A witness told him that a woman shot another woman. The shooter was heading north on Griswold Street and was wearing "a camouflage outfit." This woman was the defendant, and Espinal took her into custody.

¶ 5        Officer Brett Lawrence also responded to the incident and assisted with taking the defendant into custody. He also stated that she was wearing camouflage. Lawrence then went to a house at 2431 West Starr Street (the house), where he observed Jaylin on the porch. She appeared to be dead. A firearm was located on a chair inside a white t-shirt. Paul Tuttle and David Buss with the crime scene unit collected the gun from the porch and took crime scene photographs. Bullets were recovered from the ceiling of the porch and from Jaylin's body during an autopsy. Tuttle examined the gun for fingerprints but did not find any. He also swabbed the gun for DNA but did not believe the swab was ever submitted to the crime lab.

¶ 6        The parties stipulated to the chain of custody and authenticity of videos collected from the Starr Street Market (the Market) outdoor security cameras. Both the State and the defense played clips of the security footage from different angles. The defense also played a video from Little Star Grocery, across the street from the Market. None of the videos provide a perfect view of the incident. The videos show several individuals exit a vehicle parked on the street. A woman (identified as Jaylin) had an altercation with a man. The individuals then disappear from view. Another angle showed the porch of the house and Jaylin running around the house. She runs up

2

onto the porch, raises her hand over her head, and strikes another individual. One of the individuals falls off the porch and is approached by a man. Jaylin appears to fall forward. The man returns to the porch.

¶ 7        Detective Roberto Vasquez testified that he reviewed the videos from the Market. He also had occasion to observe Jaylin deceased on the porch and attend her autopsy. He saw the defendant at the Peoria police station after she had been apprehended. She did not have any injuries. She was wearing a camouflage outfit at that time. A photograph of the camouflage outfit was entered into evidence, and Vasquez identified it as the clothing the defendant was wearing. Vasquez stated that the defendant and Jaylin could be seen on the video. He stated that he had viewed the video during his investigation, had seen what Jaylin was wearing when she was on the porch when he arrived at the crime scene, and identified her on the video.

¶ 8        Dustin Johnson testified that he was employed by the Illinois State Police at the Morton Forensic Science Laboratory as a forensic scientist specializing in firearms identification. He determined that the two projectiles (from the porch ceiling and Jaylin's autopsy) were fired from the firearm found on the scene. Dr. Amanda Youmans, a forensic pathologist, completed the autopsy of Jaylin and determined that she died of a gunshot wound to the head. She would have succumbed to her injuries within seconds. The bullet traveled left to right, downward, and slightly front-to-back through her head. The gun would have been positioned higher than her head.

¶ 9        The defendant testified that on September 22, 2019, she was at Montaye Phifer's house, where she had stayed the night before. Around noon that day, they were sitting on his porch when two cars pulled up. Phifer walked off the porch. Seven people got out of the two cars, most were female, and they were all around 20 to 30 years old. The defendant did not know any of the people. Jaylin got out of one of the vehicles and "attacked" Phifer. The defendant had seen Jaylin once

3

before when she "attack[ed]" Phifer's younger brother. On that occasion Jaylin hit Phifer's brother in the face and spit on him, and Phifer tried to stop her and put her back in the vehicle.

¶ 10    The defendant stepped off the porch and into the front yard to see what was going on. She heard arguing and yelling. Jaylin asked the defendant if her name was Denise and told the defendant she was going to beat her ass. She repeated this several times. At that point Jaylin was approximately eight feet from the defendant, and she started to come towards the defendant. Phifer grabbed her and tried to keep her from approaching the defendant. Phifer tried to put her in the car and told the people to leave, but Jaylin continued to approach the defendant. Jaylin began hitting Phifer in the face, pulling his hair, and spitting on him. The other six people from the cars were yelling at the defendant. Jaylin and Phifer went towards the back of the house, and the defendant went to the porch. She was unable to see Jaylin and Phifer from her position on the porch. She started to look for her purse, phone, and keys. She saw a white shirt on the porch and lifted it up to see if her belongings were under it, when she saw the gun. The gun belonged to Phifer, and she had seen it on the porch before. When she found the gun, she held onto it because she was scared of being attacked by the people that had just arrived. The defendant heard Phifer telling the people to leave.

¶ 11    The defendant stated that she was facing one direction as four people came from the side of the house and yelled at her. Jaylin came around the other side of the house, so the defendant did not see her. The defendant was then struck in the back of the head "at least three times." She was also being pushed. The defendant had the gun in her hands and stated that she "shot the gun out of fear that [she] was being hit with an object or being jumped." She did not know how many times she shot the gun but stated it was more than once. She did not see where she was shooting. She just shot the gun, and then fell backwards off the porch as she was pushed. She got up and walked

4

towards the back of the house. Phifer took the gun from her and told her to leave. She started walking on Griswold Street towards her house. She stated she shot the gun because she was afraid, and she never meant to hurt anyone. She said she thought her eyes were closed when she fired the gun. Jaylin did not have any kind of weapon.

¶ 12 The jury received jury instructions for first degree and second degree murder and found the defendant guilty of second degree murder. The defendant filed a motion for a new trial and judgment notwithstanding the verdict, which was denied.

¶ 13 A sentencing hearing was held on August 28, 2020. The parties agreed that the sentencing range on second degree murder, a Class 1 felony, was 4 to 40 years' imprisonment, to be served at 50%. It was also eligible for probation. The State presented no evidence in aggravation. Jaylin's mother, brother, and twin sister gave victim impact statements. The State asked for the maximum sentence, and the defense asked for probation. The defendant gave a statement in allocution, apologizing to Jaylin's family. The court sentenced the defendant to 10 years' imprisonment followed by two years of mandatory supervised release. In doing so, the court noted that it considered all of the evidence presented at trial and sentencing. The court noted in mitigation that there was strong provocation, the defendant would be likely to comply with the terms of probation, and there would be an excessive hardship on her young child. The court then stated:

> "In aggravation, obviously, the shooting caused serious harm. You do to some extent have three incidents at the Peoria County Jail. I don't know what happened with the inmate, but I kind of look more at the correctional officers and why you couldn't follow their direction and wondering about whether or not you would comply with the terms of probation, and then I get to the part about the sentence is necessary to deter others.

5

None of these cases are easy. There's loss to both sides. They have lost a daughter, a stepdaughter, a sister. Children are being deprived of their mother. Nothing we do today will bring back Jaylin Williams. Your family are being deprived of your time and attention. Your children are being deprived of your time and attention.

We have a community where everybody is carrying guns. I went back through your testimony trying to understand what was on your mind about the self defense. Every time we have a fight it's not justification for taking another person's life, and somehow, any time a person strikes us or spits at us we feel that we're going to act in self defense and say that we felt that we were in serious threat of imminent great bodily harm or they were going to take our life, and that's really not the case.

I do understand that Jaylin came up to the porch where you were at and that's provocation, but I do also understand that you were sitting there with the handgun in your hand when she came. You were prepared for her or anybody else who came up on that porch, so what message do I send to this community about what is acceptable behavior?

I got young men riding around in cars shooting at each other; shooting back at each other. I got you on the porch waiting for them to come up. You choose not to go into the house. You choose not to find your phone, because I understood you came off that porch, saw Jaylin Williams fighting with Monty. I don't know Monty's last name. I only know from during the course of the trial where his name came up--his last name came up, rather.

6

I understand that from what [the State] said during the course of some of these questions of you that Jaylin Williams was 5'7" 150 pounds. I read the presentence investigation report, and I realized you're 200 pounds. You're bigger than her. Jaylin Williams, by all the evidence before me, had no weapons. This appeared to be more of a fistfight that became a shootout. So you came to the fight with a gun, and she came with her hands, and Jaylin Williams is now dead.

There's nothing about today's sentence that would bring her back, but at some point it does have to stop. We're going to have to quit resorting to guns to resolve our disputes or quit saying, well, I was acting in self defense because they were going to hit me and I didn't really know what was going on and I was fearful.

If you were so fearful, you'd have gone in the house. Because you went up to that porch looking for your phone, your purse, and your keys, but you stopped when you found the gun and picked up the gun, and that's what you chose to use."

The defendant filed a motion to reconsider sentence, which the court denied. The defendant appealed.

¶ 14                                    II. ANALYSIS

¶ 15        On appeal, the defendant argues (1) the evidence was insufficient to prove her guilty of second degree murder and (2) the court considered two improper factors during sentencing.

¶ 16                          A. Sufficiency of the Evidence

¶ 17        When considering a challenge to the sufficiency of the evidence, we consider the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Casler*, 2020 IL 125117, ¶ 60. "A criminal conviction will not be set aside unless the evidence is so improbable or

7

unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009).

¶ 18    Section 9-1 of the Criminal Code of 2012 (Code) defines the offense of first degree murder as follows:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> > (1) he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
> >
> > (2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1 (West 2018).

Section 9-2 of the Code defines second degree murder as follows:

> "(a) A person commits the offense of second degree murder when he or she commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) Section 9-1 of this Code and either of the following mitigating factors are present:
>
> > (1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed ***; or
> >
> > (2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable.

8

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person ***.

(c) When evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. The burden of proof, however, remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code." 720 ILCS 5/9-2 (West 2018).

The elements of first degree and second degree murder are identical. *People v. Thompson*, 354 Ill. App. 3d 579, 587 (2004). It is the presence of statutory mitigating factors that reduces the offense from first degree murder to second degree murder. *Id.* Second degree murder under subsection (a)(2) is at issue, here. 720 ILCS 5/9-2(a)(2) (West 2018). This is known as imperfect self-defense and "occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995). Self-defense consists of six factors: "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of force applied, and (6) the person's beliefs were objectively reasonable." *People v. Washington*, 2012 IL 110283, ¶ 35. The defendant must prove each factor of self-defense by a preponderance of the evidence. *People v. Castellano*, 2015 IL App (1st) 133874, ¶¶ 154, 156. Once the defendant proves a

9

mitigating factor by a preponderance of the evidence, the State has the burden to disprove it beyond a reasonable doubt. *Id.* ¶ 154.

¶ 19 At issue, here, is whether the defendant's belief that a danger existed that required the use of deadly force was objectively reasonable. As the defendant states, her testimony regarding her fear was unrebutted. However, the jury was not required to believe her account of the incident. *People v. Purdle*, 212 Ill. App. 3d 594, 598 (1991). The weight to be given the evidence and the credibility of the witnesses are questions for the jury to determine, and we will not substitute our judgment for that of the jury on such questions. *People v. Bardell*, 388 Ill. 482, 485 (1944). The jury may not have believed the defendant's testimony that she did not know whether she was being hit by a club or a fist or that she was as fearful as she stated that she was. "To shoot someone in response to a punch is not reasonable self-defense *** justifying [the] use of deadly force." *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 61. The defendant did not see any of the individuals that came out of the cars carrying weapons. The defendant had seen Jaylin hit Phifer and his brother, on two occasions, using only her hands, never a weapon. Moreover, the defendant testified that she had seen on TV before that a person could kill someone by hitting them in the head with a fist. The jury may have believed that this testimony was reaching and not reliable. We also note that the defendant was alone on the porch when she decided to pick up and hold the gun, as if she was waiting for someone to approach her. She had ample opportunity to leave or go inside Phifer's house. We cannot say that no rational jury would find the defendant's belief objectively unreasonable so to set aside the conviction for second degree murder.

¶ 20 B. Improper Factors

¶ 21 The defendant further argues that the court considered two improper aggravating factors during the sentencing hearing: "its own personal views of the pervasive nature of gun violence in

10

the local community and the harm [the defendant's] actions caused to the victim." The defendant acknowledges that she did not raise this issue in the trial court but asks that we consider it under the plain error doctrine. The first step in plain-error analysis is to determine whether an error actually occurred. *People v. Mitok*, 2018 IL App (3d) 160743, ¶ 8.

¶ 22    The circuit court's sentencing decision will not be altered on appeal absent an abuse of discretion. *People v. Streit*, 142 Ill. 2d 13, 18-19 (1991). The reviewing court gives great deference to the court's sentencing decision as the circuit court is in a better position to determine the appropriate sentence. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A sentence that is within the applicable sentencing range is presumptively valid. *People v. Hauschild*, 226 Ill. 2d 63, 90 (2007).

¶ 23    The sentencing hearing is an inquiry into the pertinent facts and circumstances in order for the court to exercise its discretion in determining the appropriate sentence. *People v. Irby*, 237 Ill. App. 3d 38, 70 (1992). The court may search anywhere within reasonable bounds for facts that may serve to aggravate or mitigate the offense, including *inter alia*: the defendant's personality, propensities, purposes, tendencies, general moral character, habits, social environment, abnormal tendencies, age, natural inclination or aversion to commit crime, stimuli motivating her conduct, family life, occupation, and criminal record. *People v. Moore*, 250 Ill. App. 3d 906, 919 (1993); *People v. Fort*, 229 Ill. App. 3d 336, 341 (1992). However, the court may not consider an improper factor in sentencing the defendant, unless the factor is an insignificant component of the defendant's sentence. *People v. Joe*, 207 Ill. App. 3d 1079, 1085 (1991). When determining the correctness of the defendant's sentence, we must consider the record as a whole, and not focus on a few words or statements made by the trial court. *Fort*, 229 Ill. App. 3d at 340. "To be entitled to a remand for resentencing, a defendant who has alleged error must show more than the mere mentioning of the improper factor in aggravation: the defendant bears the burden of showing that

11

the trial judge relied upon the improper factor in fashioning the defendant's sentence." *People v. Brown*, 2019 IL App (5th) 160329, ¶ 18.

¶ 24    First, the defendant argues that the court considered its personal views on the pervasive nature of gun violence in the Peoria area. We disagree. The court's comments show that he was considering the seriousness of the offense and the necessity of the sentence to deter others from committing the same crime. See *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). The comments showed only that carrying guns and using them in the way the defendant did, here, is something that needs to be stopped in the community, which necessitated the defendant's sentence.

¶ 25    Second, the defendant argues that the court considered a factor inherent in the offense— the harm to the victim. As the defendant acknowledges, the court did not expressly state that it was considering harm to the victim as an aggravating factor. The court stated, "In aggravation, obviously, the shooting caused serious harm." It then went on to state, "There's loss to both sides. They have lost a daughter, a stepdaughter, a sister. Children are being deprived of their mother. Nothing we do today will bring back Jaylin Williams. Your family are being deprived of your time and attention. Your children are being deprived of your time and attention." When considering the entirety of the court's statement, it is clear that it was considering the harm to the victim's family and to the defendant's family, which was a proper consideration. See *Brown*, 2019 IL App (5th) 160329, ¶ 22. The court did not consider improper factors in reaching its sentence.

¶ 26                                III. CONCLUSION

¶ 27    The judgment of the circuit court of Peoria County is affirmed.

¶ 28    Affirmed.